**TECHNICON INSTRUMENTS CORPORATION, Plaintiff,**

v.

**COLEMAN INSTRUMENTS, INC. and American Hospital Supply Corporation, Defendants.**

No. 63 C 738.

United States District Court
N. D. Illinois, E. D.

June 7, 1966.

Homer J. Schneider, Wolfe, Hubbard, Voit & Osann, Chicago, Ill., for plaintiff.

George B. Newitt and Sheldon W. Witcoff, Bair, Freeman & Molinare, Chicago, Ill., for defendants.

## FINDINGS OF FACT
### and
## CONCLUSIONS OF LAW

PERRY, District Judge.

The above entitled cause having come on for trial, and the court having heard the evidence, and having observed the witnesses and considered their testimony, having examined the exhibits introduced at the trial, having examined and considered the briefs submitted by counsel, having given careful consideration to the record in this cause, and being fully advised in the premises, now finds the facts and states the conclusions of law as follows:

### FINDINGS OF FACT

I. THE PARTIES, THE ACTION AND THE ISSUES *

1. Plaintiff Technicon Instruments Corporation is a New York corporation which manufactures and sells analytical equipment for chemical analysis. Defendant Coleman Instruments Corporation, a Delaware corporation, and ultimate successor to original Defendant Coleman Instruments, Inc., also a Dela-

---

* Findings 1–4 incl., have been stipulated by counsel for the parties.

ware corporation, also manufactures and sells chemical analytical equipment and has a regular and established place of business in Maywood, Illinois in this district. Defendant American Hospital Supply Corporation is an Illinois corporation which distributes various products to the hospital trade and serves as a distributor of certain products manufactured by Defendant Coleman Instruments Corporation. American Hospital Supply Corporation has a place of business at Evanston, Illinois in this district. (Reference to "defendant" herein indicates Coleman Instruments Corporation, or its predecessor Coleman Instruments, Inc., unless otherwise indicated).

2. The complaint alleges a cause of action for infringement of four patents and the jurisdiction of the court arises from the Patent Laws of the United States. Both defendants have counterclaimed for a declaration of non-infringement and invalidity of the same patents. The venue is properly laid in this district.

3. The four patents in suit are owned by Plaintiff Technicon and involve apparatus that analyzes, on a continuous basis, samples of various liquids to determine the quantity of certain constituents in these liquids. For example, the apparatus is useful in determining the amount of sugar or urea (crystalloids) present in human blood. The patents in suit and the claims charged to be infringed are as follows:

| PATENT | ISSUED | TITLE | CLAIMS |
|---|---|---|---|
| Skeggs 2,797,149 | June 25, 1957 | Method and Apparatus for Analyzing Liquids Containing Crystalloid and Non-Crystalloid Constituents | 4, 14 16, 19 |
| Skeggs 2,879,141 | March 24, 1959 | Automatic Analyzing Apparatus | 10, 16 |
| Ferrari et al 2,865,303 | December 23, 1958 | Pumps | 8 |
| Ferrari et al 2,935,028 | May 3, 1960 | Pumps | 14 |

The '149 patent contains apparatus claims 4, 14, 16 and method claim 19 directed to an entire system for quantitative automatic analysis of crystalloids using flowing streams. Claim 10 of the '141 patent is directed to a sampling device for feeding a series of liquid samples successively to the apparatus disclosed in the '149 patent, and Claim 16 of that patent is directed to apparatus for treating a liquid for processing which employs means for injecting air into a stream of the liquid to divide the stream into alternate segments of liquid separated from each other by intervening segments of air. The '303 and '028 patents relate to pumps useful for pumping liquid streams to and through tubing comprising part of the apparatus of the '149 patent.

4. Defendants Coleman and American Hospital Supply Corporation are charged to have infringed the plaintiff's patents by reason of manufacture and use of an analytical apparatus called the Coleman Chem-Matic (DX–23). Defendant American Hospital Supply Corporation contends that it has never made, used or sold a single Chem-Matic apparatus and is therefore not an infringer. Defendants contend that Claims 4, 14, 16 and 19 of the '149 patent and Claim 10 of the '141 patent are not infringed by the Chem-Matic, and if they are so construed

by plaintiff they are invalid over the prior art; that Claim 16 of the '141 patent is invalid for several reasons; that Claim 8 of the '303 patent and Claim 14 of the '028 patent are not infringed by the Coleman pump used in the Chem-Matic and are invalid over the prior art.

## II.  VALIDITY AND SCOPE OF THE TWO SKEGGS PATENTS

5.  The inventions represented by the four patents in suit have been embodied in commercial apparatus sold by Technicon as the "AutoAnalyzer" analytical equipment.

6.  For many years prior to the inventions of Leonard T. Skeggs, and indeed until the AutoAnalyzer was placed on the market, body fluids such as blood had customarily been analyzed for diagnositically significant factors by manual methods.  These required a complicated sequence of many operations and involved careful weighing or measurements together with record keeping, and consequently were time-consuming and subject to errors.  Manual analyses were also expensive and required cleaning of equipment.

7.  In the analysis of body fluids, whether made manually or automatically, it is usually necessary as a preliminary to the final determination to separate dissolved components ("crystalloids"), that are to be analyzed, from suspended components ("non-crystalloids") such as colloidal proteins, corpuscles, and the like.  A chemical reagent of a type that changes color in the presence of one of the dissolved components is then mixed with the dissolved components, and the resulting color change is determined. The color change is an indication of the original concentration of the dissolved component in the body fluid sample.

8.  Skeggs, as a research biochemist conducting work in hypertension and artificial kidneys in a hospital, also had responsibility for the hospital's clinical chemistry laboratory where colorimetric tests of blood samples for diagnostically significant factors were performed manually.  Because of his dissatisfaction with the manual tests, he became interested in the possibility of automatic analysis of body fluids.

9.  Skeggs, working long hours at home and financing his efforts on borrowed money, conceived and reduced to successful practice the first practical system for the automatic analysis of body fluids for diagnostically significant substances.  In contrast to the stepwise manual methods which required careful weighings or volume measurements, Skeggs formed body fluid samples (containing crystalloids and non-crystalloids) into a flowing stream, continuously separated from the stream a portion of the crystalloid in proportion to the amount originally present, combined this separating portion with a proportional stream of a color-changing reagent, and analyzed the combined stream.  Dr. Skeggs personally made and tested equipments for demonstrating his system.

10.  The term "non-crystalloids" in the claims of the Skeggs '149 patent is not a common term but is easily understood and defined from the specification by those skilled in clinical chemistry and clinical pathology.

11.  None of the prior art identically disclosed or described Skeggs' system, nor would his system have been obvious to a person skilled either in the art of automatic chemical analysis or the art of body fluid analysis.  The art (Hewson U.S. 2,560,107) showed an automatic apparatus for determining blood sugar content that operated like a mechanized manual system, in that tablets of different reagents were added to a blood sample in a test tube to coagulate the proteins and to obtain a color change, and the test tubes were moved through heatings, cooling, and agitating stages; this did not continuously separate a portion of the crystalloid (sugar) and there were no proportional flows.  The art (Alston et al. U.S. 2,408,900) also showed proportional gravity flows of sample and reagent streams in a device for detecting the presence of sugar in boiler feedwater; this had a screen and a filter to remove pieces of boiler scale but neither

is capable of separating crystalloids from a sample containing crystalloids and non-crystalloids. The Alston et al. reference is the closest prior art; it was cited and overcome during prosecution of both Skeggs patents; and it is incapable of analyzing body fluids.

12. The means disclosed in the Skeggs '149 patent for continuously separating a proportional amount of crystalloids from a sample containing crystalloids and non-crystalloids was a continuous dialyzer using a semi-permeable membrane of cellophane or the like. Dialyzers per se had long been used to separate crystalloids from non-crystalloids, and they do this by permitting molecules of crystalloid to pass through tiny holes or pores in a semi-permeable membrane which are too small to allow non-crystalloids through. This was the best mode know to him (Skeggs)—both at the time he filed the '149 application and at present—and is used in most of the AutoAnalyzers. Claims 4, 14, 16, and 19 of the patent, the claims in issue here, are not limited to continuous dialysis; other claims in the patent call for dialysis.

13. Various statements in the file wrapper of the '149 patent application, in the testimony of Dr. Skeggs, and in advertisements and later-filed patent applications by the Technicon company which characterized Skeggs' system as one employing a dialyzer all referred to the best mode, or specific embodiment, disclosed in his patents. None purported to characterize the scope of Skeggs' claims.

14. While working on his system invention as described above, Skeggs accidentally discovered that samples could be analyzed many times more rapidly and with less contamination between samples by introducing an air bubble between successive samples (Claim 10 of the '141 patent covers this in combination with an automatic sampler). This contamination between or running together of samples leads to false analyses. This discovery was demonstrated by an experiment he conducted in the court-room. Skeggs devised the technique of introducing air bubbles into other conduits of his apparatus to separate the individual samples or sample constituents, and to segment each sample or constituents of a sample into alternate segments of liquid and air (Claims 14 and 19 of the '149 patent; Claim 16 of the '141 patent). This procedure further improved his system in the above respects, and also improved mixing and heating. Skeggs analytical system is operable without any bubbles, but less speedy.

15. In the '141 patent Skeggs disclosed an automatic apparatus for sampling a series of sample containers. The containers are placed around the periphery of a slowly rotating disc, and a sample intake tube connected to the suction of a pump is positioned so that as the disc rotates the tube is immersed successively into each container. When the tube is between two containers, air is drawn into the tube in order to provide an air bubble between successive samples. The defendants did not contest validity of Claim 10 directed to this sampling apparatus.

16. The concepts of introducing an air bubble between successive samples, and of introducing air bubbles into other conduits to separate and segment individual samples and sample constituents, were disclosed in the original '149 application and in the original '141 application by disclosing systems that would inherently and inevitably include such bubbles. Amendments to the specifications of these applications and to the objects of the '141 application while the respective applications were pending explained the theory, function and advantages of these air bubbles and did not constitute new matter.

17. The prior art cited by the defendants does not show or suggest the use of bubbles for any function analogous to that of Skeggs. The Pregl reference ("Quantitative Organic Microanalysis", 1951) used air bubbles as a substitute for a pump to lift a fluid. The Kristskii reference ("Biochimiya", 1948) left an air space in a dialyzing sac so its contents could be shaken more easily. Neither of

the references disclosed or suggested the introduction of air bubbles into a flowing stream, and neither showed air bubbles to separate different samples.

18. Many AutoAnalyzers do not employ proportional separation of a portion of the crystalloids from a sample containing crystalloids and non-crystalloids (and so are not within the claims of the Skeggs '149 patent) but which use the bubble invention of claim 16 of Skeggs '141.

19. Although the invention defined in claim 16 of the Skeggs '141 patent was in public use, on sale, and published more than one year before the Skeggs '141 application was filed, it was not in public use, on sale, or published more than one year before the earlier Skeggs '149 application was filed. Both applications as originally filed disclosed the invention of this claim; both were by the same inventor; the '141 application was filed before the '149 application issued as a patent; and the '141 application contains a specific reference to the '149 application and patent.

20. Technicon acquired rights to Dr. Skeggs' invention and spent several years perfecting the mechanical components, increasing the versatility of the system, and testing the system before bringing the AutoAnalyzer onto the market.

21. Once it became available, the AutoAnalyzer was promptly recognized by clinical pathologists and clinical chemists as a reliable and valuable tool, and they began using it to replace the manual tests and to extend the scope and quantity of analyses. For the first time, vital diagnostic information could be supplied to physicians more promptly, at least as accurately, and with less vulnerability to error in comparison with the former manual procedures. Important labor savings have been achieved by its use. Over two hundred articles in scientific journals have been written describing a variety of analytical procedures conducted with the AutoAnalyzer, many of these articles being unsolicited and independent of sponsorship by Technicon.

22. The AutoAnalyzer has had a dramatic impact on the improvement of health services to the public. Because of the AutoAnalyzer's ability to provide rapid, accurate and low cost analyses, physicians have been able to institute routine screening programs of supposedly healthy patients. This has led to the detection of numerous unsuspected cases of diabetes and kidney disfunctions.

23. The AutoAnalyzer has had overwhelming and undisputed commercial success. More than six thousand AutoAnalyzers have been sold, at a cost substantially in excess of the cost of manual equipment. Three-fourths of all American hospitals having over two hundred beds use at least one AutoAnalyzer. There is no evidence of unusual advertising or promotional expenditures.

24. At the beginning of trial, Technicon offered to file a terminal disclaimer under Title 35 U.S.C. § 253, disclaiming so much of the term of the Skeggs '141 patent as would extend beyond the expiration of the term of the Skeggs '149 patent. Technicon has since filed such a terminal disclaimer.

III. VALIDITY AND SCOPE OF THE TWO PUMP PATENTS

25. One of the difficulties Skeggs encountered in his development was the provision of a suitable pump. Skeggs modified a commercial pump, to meet his proportional flow requirements. However, this was only partly satisfactory. The special pump tubes Skeggs had made wore rapidly, and it was difficult to replace individual pump tubes when worn, or to replace all tubes quickly when changing from one kind of test to another as was found convenient. Lastly, it was also desirable to reduce the effect of stretching and limpness in the tubes which developed after extensive use.

26. Technicon's employees, Andres Ferrari, Jr., and Jack Isreeli, solved the foregoing problems. Their work is reflected in the Ferrari '303 patent and the Ferrari '028 patent in suit. Both patents are improvement patents on a type of pump, itself old in the art, which propels

fluid through a flexible tube by closing a portion of the tube with a roller pressed against a backing surface or platen and advancing the roller. This type of pump uses rollers mounted along the periphery of either a rotating drum or an endless chain.

27. The Ferrari '303 patent disclosed, for such a flexible tube pump provisions for simultaneously propelling fluid through several tubes of the same or different internal diameters and wall thicknesses and did this by mounting the platen resiliently so that it would yield to a greater extent beneath thicker walled tubes than under thinner ones. It also provided a hinge between the roller assembly and the platen so that the drum or belt could be swung away from the platen to make the tubes accessible for replacement, and provided a latch for the assembly.

28. The remaining problems were solved by the Ferrari '028 patent. This patent disclosed providing a collar near the end of each tube, together with a multiple-grooved bracket at each end of the pump. Each tube fits into corresponding grooves in each bracket, while the collars engage the brackets and are held firmly in position. To stretch the tubes one or both of the brackets is mounted adjustably, with a pair of pins on the pump base and several holes in the bracket so one bracket could be moved further away from the other to increase tube tension. The '028 patent retained the latchable hinged mounting of the '303 patent. With these features any one tube could be replaced when worn, or all tubes together with the brackets could be replaced when changing to different analytical tests.

29. The Ferrari '303 patent disclosed both the drum type and the endless chain type pump. Claim 8 in issue reads on both forms. The Ferrari '028 patent disclosed only the endless chain type pump, but Claim 14 in issue reads on both the rotating drum or the endless chain.

30. During the Patent Office prosecution of the Ferrari '303 patent the Patent Office cited a patent to one Stocks (U.S. No. 2,466,618). The attorney cancelled all previous claims and inserted new claims, some of which, including Claim 8 of the patent, contained the expression "unitary backing means" while one claim (Claim 1 of the patent) did not. This expression was not relied upon as the sole distinguishing feature over the Stocks patent.

31. Each of the elements defined in the claims of these two patents can be found in other combinations in prior art. Neither of the claimed combinations is identically described or disclosed in the prior art, and defendants offered no evidence that the respective combinations of the claims would have been obvious to a person skilled in the art at the time the inventions were made.

## IV. THE ACCUSED CHEM-MATIC

32. The success of the AutoAnalyzer aroused the envy of the defendants. Coleman had no competitive device and, since Technicon sold directly rather than through distributors, American Hospital Supply had no share of the market.

33. Coleman surreptitiously bought an AutoAnalyzer through one of its consultants who made the purchase in the name of the hospital with which he was affiliated. The consultant arranged for one of Coleman's engineers to spend a week at the hospital learning how its AutoAnalyzer operated, and took the new AutoAnalyzer to Coleman's laboratory, where it became the basis of the Coleman design.

34. By stipulation of all parties, infringement issues are limited to the single Chem-Matic instrument brought into the courtroom. The operation of this Chem-Matic was demonstrated by the defendants with a simulated sample (having no practical utility) containing an iron compound and a chromate compound. According to defendants, the Chem-Matic was unable to perform analyses of actual body fluids by reason of its heater component and its printer component (which prints out the results of an analysis) being inoperative. The Chem-Matic exhibited in court differed

only in evolutionary details from the instrument exhibited by Coleman at national conventions before suit was filed.

35. The Chem-Matic samples are placed in small vials along a row, and an inlet tube is arranged movably along the row, so it can dip into the successive samples. Samples are automatically withdrawn via the inlet tube from each vial in succession in the form of a flowing stream, with air passing through the inlet tube between samples. Once a sample enters the Chem-Matic as a stream, it is mixed with a stream of a reagent that precipitates or coagulates non-crystalloid constituents (in the Chem-Matic demonstrated in court, precipitation was simulated by reacting an originally soluble iron compound with an ammonia solution to form insoluble ferric hydroxide).

36. The combined stream of sample and precipitating reagent flows to a continuous filter. This comprises filter paper that is continuously fed from a roll thereof over a perforated block, so that liquid containing dissolved crystalloid flows through the paper and through the perforation while precipitated material remains behind on the paper. In an actual analysis of body fluid samples less than half the sample would pass through the filter paper. That portion of the liquid containing dissolved crystalloid which passes through the filter paper is sucked through under slight vacuum and forms a flowing stream segmented by random air bubbles. This stream flows to a "debubbler", consisting of a tee that permits an unbroken stream of liquid to be withdrawn from the debubbler at constant flowrate, while a mixed stream of liquid and air is discarded. (The volume of discarded liquid was measured in court and is approximately 2.8 times the volume of the unbroken stream withdrawn from the debubbler). The flowrates of sample stream, precipitating reagent stream, unbroken stream withdrawn from the debubbler, and mixed stream of liquid and air pass through the same multiple tube pump, and are each maintained at flowrates proportional to each other.

37. The unbroken stream of liquid withdrawn from the debubbler contains a portion (approximately one-ninth) of the crystalloids in proportion to the quantity of crystalloids in the original sample. This unbroken stream is then mixed with a stream of reagent that reacts with dissolved crystalloids to provide a color change that is measured to provide an indication of the amount of crystalloid present in the original sample. The reagent stream is segmented by air bubbles injected by pumping liquid at a low flowrate into a tee having one end open to the atmosphere, and from which liquid and air are pumped away at a higher rate. Coleman's Chem-Matic, when used for body fluid analysis, has a heater to heat the stream of reagent and separated crystalloids, and a spectrophotometer or colorimeter to measure the color of the stream. The results are intended to be printed out on a recorder connected to the colorimeter.

38. Coleman's Chem-Matic pump is a multiple flexible tube pump which uses a rotating drum provided with several rollers along its periphery, and a platen composed of sections of resilient material with each section superimposed over one tube. The sections are held together in a unitary assembly, and the assembly is mounted on top of the rotating drum with a latchable hinged mounting so that it may be swung away to provide access to the tubes. The tubes have collars at each end, and the tubes are positioned within grooves in a pair of brackets located at opposite ends of the pump. One of the brackets has a pair of holes, and the pump is provided with two sets of pins so that this bracket may be moved further away from the other as the tubes stretch in use.

## V. INFRINGEMENT BY THE CHEM-MATIC OF THE PATENTS IN SUIT

39. The system employed in the Chem-Matic exhibited at the trial of this cause is accurately depicted by Plaintiff's Exhibit No. 34, a document prepared and furnished by defendant Coleman, except that the reagents are those for a blood glucose analysis. The Chem-Matic sys-

tem is fairly and accurately summarized by the Annex to Plaintiff's Reply Brief. Defendants' Exhibit 1 does not correctly represent the Chem-Matic and is misleading; it fails to show relative flow-rates, ignores the crystalloids not passing through the filter, omits the debubbler, omits the pumps, and ignores the fact (demonstrated during trial) that a substantial amount of the solution passing through the filter is deliberately discarded at the debubbler. There is no evidence that Defendants' Exhibit 1 shows a device that was ever made or was ever the subject of controversy between the parties.

40. The combination in the Chem-Matic of a precipitating reagent stream, a continuous filter, and a debubbler is, in the sense of the '149 patent, a means or zone for separating from a flowing stream of a sample containing crystalloid and non-crystalloid constituents a portion of the crystalloid in proportion to the original quantity in the sample. The stream of reagent that mixes with the unbroken stream withdrawn from the debubbler is, in the sense of the '149 patent, a "second" stream.

41. The combination of Paragraph 41 does not represent any departure from the essential features of the Skeggs '149 patent in suit, and is the full equivalent of Skeggs' continuous dialyzer. Both the continuous dialyzer and the aforesaid combination separate a portion of the crystalloids (from a sample containing crystalloids and non-crystalloids) in proportion to the quantity originally present in the sample; both make the separation relying on the difference in size between dissolved crystalloid molecules and larger non-crystalloid particles; and both use for the separation a porous medium (a dialyzer in Skeggs' system, filter paper in the Chem-Matic) having holes sufficiently large to permit crystalloids to pass while retaining particles larger than the pores. Skeggs' dialyzer and the Chem-Matic's combination of precipitating reagent, continuous filter, and debubbler do substantially the same

thing in substantially the same manner and accomplish the same result.

42. In the Chem-Matic, introduction of air into the reagent stream to segment the stream and thereafter combining this stream with the unbroken stream of separated crystalloids from the debubbler, is solely for the purpose of acquiring the benefits of air segmentation taught in the Skeggs patents.

43. The accused Chem-Matic responds literally to apparatus claims 4, 14 and 16 of the Skeggs '149 patent and, if used for the analysis of a crystalloid substance in a sample which also contains a non-crystalloid constitutent, would respond literally to method claim 19 of that patent. The Chem-Matic does or would do the same work in substantially the same manner to produce the same result as the system disclosed in the '149 patent.

44. Plaintiff has shown that the accused Chem-Matic responds literally to claim 10 of the Skeggs '141 patent, and that each mechanical element does the same work in substantially the same way and accomplishes the same result as the structure shown in the Skeggs '141 patent. Defendants' patent expert denied this, but his testimony was admittedly based entirely on what he had been told about the internal mechanical details of the Chem-Matic.

45. The accused Chem-Matic responds literally to claim 16 of the Skeggs '141 patent. In the accused system, introduction of air into the reagent stream to segment this stream, and thereafter combination of this stream with the unbroken stream of separated crystalloid from the debubbler, are substantially similar to the system of the Skeggs '141 patent; they operate in substantially the same manner, and produce the identical result.

46. The accused Chem-Matic pump responds literally to claim 8 of the Ferrari '303 patent except that the Chem-Matic utilizes a series of individual flexible platens mounted in a unitary structure above the respective tubes instead of a single or unitary platen flexibly mounted to the pump base. The accused

structure is substantially similar to the structure of the patent; it operates in substantially the same manner, and produces substantially the identical result.

47. The accused pump responds literally to claim 14 of the Ferrari '028 patent. In the Chem-Matic pump the tubes are above the rollers whereas in the patent the tubes are below; and in the Chem-Matic one of the tube mounting blocks is made adjustable by providing one set of holes and several sets of pins whereas in the Chem-Matic it is made adjustable by providing one set of pins and several sets of holes. Neither inversion avoids the literal language of the claim or the full equivalence to the disclosed structure.

## VI. COLEMAN'S COUNTERCLAIM FOR WRONGFUL FILING OF THIS LAWSUIT

48. Coleman filed a counterclaim against Technicon, charging Technicon with wrongfully bringing this patent infringement suit. Coleman demanded $500,000 compensatory damages and $500,000 punitive damages. No evidence was presented as to any damage proximately caused by the lawsuit. Coleman completely failed to sustain the burden of showing that Technicon filed this suit in bad faith and without probable cause. Technicon affirmatively proved its good faith and that it had probable cause.

49. The equities in this suit are found to be with the plaintiff Technicon, and the plaintiff should prevail over the defendants.

50. The indicated claims of the patents in suit have each been infringed by the Chem-Matic structure.

51. Any finding of fact entered herein which may be construed in whole or in part as a conclusion of law shall be so deemed and treated as if set forth under Conclusions of Law herein.

## CONCLUSIONS OF LAW

■■ 1. The starting point in any consideration of patent validity is Title 35 U.S.C., § 282: "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." The burden is a heavy one, and proof of patent invalidity must overcome the presumption based on the technical and legal expertise of the Patent Office.

Where the closest prior art was cited by the Patent Office and there overcome, the statutory presumption of validity is enhanced. If the closest art was not cited the presumption of validity is weakened but is not thereby destroyed.

■ 2. Under 35 U.S.C. § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved and against this background, the obviousness or nonobviousness of the subject matter is determined. (Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545)

■ 3. In determining whether an alleged invention was in fact "obvious", such factors as how long the need existed, how many tried to find the way, how long the surrounding and accessory arts disclosed the means, and how immediately the invention was recognized as an answer by those who used it, are all proper tests for the court to apply.

■ 4. Commercial success of the patentee's device, coupled with a showing that the invention filled a long-sought need, is supporting evidence which may be utilized to determine that the invention was not obvious. Where there is no evidence of any unusual advertising or other means to promote acceptance, and where the purchasers are discriminating, commercial success must be attributed to the invention itself.

5. The fact that a defendant who is experienced in the design of scientific instruments for hospital use found it necessary to base its development on the plaintiff's analyzer is further evidence that the plaintiff's device was not obvious to persons having ordinary skill in the art.

■■ 6. By disclosing in a patent application a device that inherently per-

forms a function, operates according to a theory, or has an advantage, a patent applicant necessarily discloses that function, theory, or advantage even though he says nothing concerning it. The application may later be amended to recite the function, theory, or advantage without introducing prohibited new matter. In any event, the fact that the Patent Office allows such an amendment without objection thereto as new matter (within the meaning of Title 35 U.S.C., § 132) is entitled to an especially weighty presumption of correctness.

7. Provided the conditions of Title 35 U.S.C., § 120 have been met, where the subject matter of an invention disclosed and claimed in one patent is also disclosed in an earlier application, the effective filing date of a claim to the invention is that of the earlier application. There are no conditions other than those of Title 35 U.S.C., § 120.

8. If a subcombination can be used without using a complete combination, a later-filed and later-issued but copending patent claiming the subcombination is not invalid for double patenting over an earlier filed and issued patent claiming the combination.

9. Even in a situation where two patents issue at different times under circumstances where there would ordinarily be double patenting, a terminal disclaimer under Title 35 U.S.C. § 253 which causes them to expire simultaneously eliminates any extension of monoply. In the absence of proof of other vices that could stem from double patenting, the second issued patent is not invalid for this reason alone.

10. The one year statutory bars to patentability under Title 35 U.S. C. § 102 apply as of the date the subject matter of an invention was first disclosed in a patent application, not as of the date a claim thereto was first offered. Claims of a patent are not invalid if there was a publication, public use, or sale of the invention more than a year before the claims were first presented but not more than a year prior to the filing of the application disclosing the invention.

11. Where infringement is charged of a claim for a combination having one or more elements expressed as a means or step for performing a specific function without the recital of structure, material, or acts in support thereof, Title 35 U.S.C. § 112 requires construction of the claim to cover both the corresponding structure, material, or acts described in the specification and equivalents thereof. What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. The first inquiry as to infringement of such claim is whether there is infringement of the terms of the claim, but this does not end the matter. Infringement is found where application of claim phraseology reads on the accused device and there is real identity of means, operation and result between the accused device and of the device shown in the patent.

12. A patentee is entitled to the broadest range of equivalents consistent with the prior art and with the file wrapper history where his patent is a pioneer in the field, where the invention has had great practical impact on the art, and where the infringer has relied on the patentee's teachings to derive its own product.

13. Infringement is not avoided by varying the apparatus shown in the disclosure of a patent, whether the variation be an improvement or an impairment. An equivalent is no less an equivalent merely because it was unfamiliar at the time of the invention.

14. File wrapper estoppel applies to an expression in a claim that was inserted and relied upon during prosecution in order to avoid specific prior art. Where the expression was not relied on as the sole distinguishing feature, as evidenced by the fact that another claim was allowed without the expression, file wrapper estoppel does not necessarily apply.

15. Manufacture or use of an apparatus covered by a patent is not any

the less an infringement because the apparatus is not sold.

16. A patentee may file suit for patent infringement if he has probable cause for believing that an act of infringement has occurred. Even if there has been no actual infringement he is not liable for damages unless the defendant affirmatively shows that suit was brought without good faith and without probable cause.

17. Claims 4, 14, 16 and 19 of U.S. Patent No. 2,797,149; Claims 10 and 16 of U.S. Patent No. 2,879,141; Claim 8 of U.S. Patent No. 2,865,303 and Claim 14 of U.S. Patent No. 2,935,028 are good and valid in law, are enforceable, and have been infringed by both defendants. An injunction should issue against infringement by each of the defendants and their privies.

18. The Supplemental Counterclaim should be dismissed.

19. Any conclusion of law entered herein which may be construed in whole or in part as a finding of fact shall be so deemed and treated as if set forth under Findings of Fact herein.