**UNITED STATES GYPSUM COMPANY,**
**Plaintiff-Appellee and Appellant,**

v.

**NATIONAL GYPSUM COMPANY et al.,**
**Defendants-Appellants and Appellees.**

**Nos. 15126, 15127.**

United States Court of Appeals
Seventh Circuit.

Oct. 2, 1967.

Rehearing Denied Nov. 7, 1967.

Certiorari Denied March 18, 1968.

See 88 S.Ct. 1184.

Albert H. Pendleton, Cranston Spray, Arthur A. Olsen, Gregory B. Beggs, James G. Hiering, Chicago, Ill., for United States Gypsum Co.

Charles J. Merriam, Allen H. Gerstein, Chicago, Ill., Merriam, Marshall, Shapiro & Klose, Chicago, Ill., of counsel, for National Gypsum Co.

Before KNOCH, SWYGERT and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

United States Gypsum Company sued National Gypsum Company and Plaza Plastering Co. for infringement [1] of the Gill patent.[2] The district court found

1. Contributory infringement and actively inducing infringement are averred against National.

2. No. 2,749,267, "Method of Covering the Joint Between Wallboard and the Re-

sultant Product," issued June 5, 1956 to Joseph W. Gill (and another whose name was improperly included and has since been removed), and assigned to plaintiff.

the patent valid but not infringed. All parties appealed.

We conclude that the district court misconstrued the patent, that the patent was infringed if valid, and that the cause should go back to the district court to consider and determine certain issues as to validity, after supplementary trial if deemed necessary.

The patent contains five claims, the first to a combination and the other four to methods, the parties and the district court having usually treated claim 5 as representative of the method claims. All claims concern the art of producing smooth, seamless joints in walls made of wallboard.

Drywall construction is presently used in over 70 percent of residential construction. Large sheets of wallboard are nailed to studding to form interior walls. Where two sheets joint, the industry has for a long time used a cement or "mud" and strips of bridging material such as cloth, metal, or paper. Machines are widely used to apply the tape. Those machines generally apply the cement to the back of the tape just before the tape is placed along the joint. Later a top coat cement is applied to make the joint smooth and indistinguishable from the rest of the wall.

The several types of tape met with varying difficulties. Loosely woven cloth tape did not have sufficient transverse strength. Smooth metal tape did not form a solid bond with adhesives. Metal tape with holes allowed the cement to exude through the holes and harden into "keys" which helped to hold the tape tight, but required sanding. Paper tape with punched holes often caused the pattern of holes to show through the finishing coat, and when used in the taping machines caused difficulty because the adhesive came through the holes before the tape was on the wall. Perforation by punching often left burrs, and nodules of cement were likely to form on the surface of the tape away from the wall. Paper tape without perforation was also used some years ago, but apparently blisters will form unless there is some way for the air to escape.

The Gill patent is directed at a particular kind of tape, with minute perforations, to be used on wallboard joints, although four claims pertain only to a method of using it, and in claim 1, the tape itself is patented only as one element of a combination. The patent office had refused to patent the tape alone and the machine devised for producing it.

Claims 1 and 5 of the Gill patent are:

"1. The combination with wallboards attached to a support and having edges in substantially abutting relationship forming a wallboard joint, of a strong thin cellulosic strip having perforations throughout with diameters from about 0.02 inch to 0.002 inch, said strip being adhesively secured over said joint and the edges of said wallboards adjacent thereto.

"5. The method of covering the joint between adjacent wallboards which comprises adhesively securing over said joint a strip of strong paper provided with substantially uniformly arranged spark-produced perforations having diameters from about 0.02 inch to 0.002 inch to permit the escape of air entrapped beneath said strip while substantially preventing the escape therethrough of adhesive employed to secure the strip in place."

*Infringement.*

The district judge first addressed himself to the question of infringement. It is clear that National has produced and sold spark perforated paper tape for use on wallboard joints and that Plaza has so used it, all without license under the Gill patent. It also appears that National's management knew of the patent and considered that there would be infringement if the patent were valid. The court, however, considered the National tape sufficiently different from the tape described in Gill so that its use did not infringe. The conclusion was based on an interpretation of Gill in three particulars which, with all respect, we consider erroneous.

Claims 1, 2, and 5 state that the perforations in the tape have "diameters from about 0.02 inch to 0.002 inch * * * ". Claim 3 says "diameters from substantially 0.02 inch to substantially 0.002 inch", and Claim 4 says "diameters of substantially 0.005 inch".

Elsewhere, in the specifications, Gill explained: "The perforations, resulting from the high potential spark passing between pairs of electrodes are minute, averaging about .005 inch in diameter, generally within the range of from .002 inch to .02 inch in diameter. Many of the openings are somewhat elongated or oval, and the diameters specified are the average diameters arrived at by averaging the minimum and maximum dimensions of the openings."

The perforations in a sample of National tape ranged in average diameter from a maximum of .0168 inch to a minimum of .0024 inch, all within the range indicated by Gill. The overall average was .0073 inch, larger than the .005 inch average indicated by Gill. This difference in the overall average was considered significant by the district judge. We disagree.

Claims 1, 3 and 4 refer to "perforations throughout". Perforations in the sample of National tape, which was 2⅛₆ inches wide, did not occur, generally, within the outer half-inch (approximately) on either side. The district judge construed "throughout" in the claims as requiring the perforation to appear throughout the complete width of the tape. Claims 2 and 5 refer to "substantially uniformly arranged" perforations. The district judge noted a description of the National tape: "The perforations appear to be arranged roughly in six rows, although the pattern seemed almost random and was not too uniform," and recalled his own observation "that it was arranged in rows as though it were fanned in a pattern."

Statements by Gill in the specifications make it clear that the expression "throughout" did not mean that the perforations must be distributed close to and up to each edge of the tape. Using tape with the common width of 2¾₆ inches, the suggested distribution would leave a margin, without holes, of ¹⁵⁄₃₂ inch along each edge. This is very close to the half inch margin in the National tape.

It is also said:

"The hole spacing and pattern in the tape are erratic. This results from the fact that the path of the sparks between pairs of electrodes varies considerably, due primarily to the lack of uniformity of the electrical resistance or conductivity on the tape itself."

The material just quoted shows that the phrase "substantially uniformly arranged" did not contemplate the symmetry and exactness of pattern which the district judge seems to have found essential.

Against the prior art background of punch perforated holes, the gist of the invention (if all tests of invention be met), was the use of tape with much smaller spark produced holes. The differences in average size of the perforations and in the exact pattern of distribution do not seem to us to warrant the significance accorded by the district judge.

We conclude that if the patent was valid, it was infringed.

Defendant raised several issues which require further consideration.

### Obviousness.

The district judge recorded his opinion, and elected to have it serve as findings of fact and conclusions of law.

He correctly concluded that the prior art did not anticipate the Gill patent. He did not, however, address himself to the issue of obviousness under 35 U.S.C. sec. 103, although in fairness it should certainly be observed that his decision was given before the decision of the Supreme Court of the United States in Graham v. John Deere Co.[3]

The analytical steps which a court must take in order to determine the issue

3. (1966), 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.

of validity under sec. 103 have now been clearly set forth in *Graham*:

"*  *  *  Under § 103, the scope and content of the prior art are to be ·determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. *  *  * "[4]

For the reasons indicated in Cloud v. Standard Packaging Corporation[5] we think it the sounder procedure for the determination of this issue to be made initially in the district court.

The issue whether the invention is obvious must, of course, be determined with respect to the invention as construed by this opinion.

### Public use.

Defendants .averred that the invention was in public use more than one year before March 30, 1950, and produced evidence which they contended would support that claim. Plaintiff contends that any use of its own was experimental and not public. The district judge so decided, and we think the finding was not clearly erroneous. The district judge also decided there had been no prior public use by others, but very clearly limited his decision to the invention as he had restrictively interpreted it in his decision of the infringement issue. Thus the issue with respect to prior public use by others will be open for decision upon remand.

### Misuse.

Defendants averred that plaintiff has misused the patent and in bringing suit was attempting to obtain a monopoly in the sale of unpatented tape with perforations of .002 inch to .02 inch in diameter.

Defendants appear to contend that a finding of misuse must follow from the fact that when plaintiff sells its own un-patented spark perforated tape it grants a license to use it under the Gill patent.

But it appears that plaintiff does license others who desire to use tape not produced by plaintiff. As we understand the relevant doctrine of misuse,[6] there could be no misuse if the terms on which a license is available to those wishing to use tape manufactured by others are reasonably comparable to the terms for one who uses the patentee's tape. Success on defendants' claim of misuse would require at least a finding that plaintiff restricts licensing for the purpose of compelling the use of its own tape.

### Alleged anti-trust violation.

Plaintiff is subject to a decree ·entered in 1951 in an action by the United States to enforce the anti-trust laws. The decree required plaintiff to grant licenses on certain patents, and restricted the royalties. Plaintiff has granted licenses under Gill and the royalties are measured by the amount of tape used. Defendants claim this is a violation of the decree, and necessarily, therefore, a violation of the anti-trust laws, so that defendant can recover treble damages, the provable damages being attorneys' fees in this action.

To put their theory together, a violation of the decree must be per se, a violation of an anti-trust law, the Gill patent must be one "relating" to the "use" of "gypsum board", and the tape must be a "patent-free" product.

The district judge, having noted and passed by the question whether the Gill patent, relating to the use of wallboard generally, can be said to be a patent relating to the use of gypsum board, concluded that since tape is used as a component of a patented process, it is not patent-free as the term was used in the decree even though unpatented. A seemingly consistent contemporaneous construction of the term by the court which issued the decree was noted. We agree with the conclusion of the district

---

4. Id. at page 17, 86 S.Ct. at page 694.

5. (7th Cir. 1967), 376 F.2d 384, 391.

6. See Mercoid Corp. v. Mid-Continent Investment Co. (1944), 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, relied on by defendants.

judge. Moreover, the decree did not merely forbid acts which are violations of the anti-trust laws and it does not follow that a violation of the decree is necessarily a violation of an anti-trust law so that treble damages would ensue.

The judgment appealed from will be reversed and the cause remanded for further proceedings consistent with this opinion.