The **BESLY–WELLES CORPORATION**, a corporation of Delaware, and **Sellew Corporation**, a corporation of Illinois, Plaintiffs,

v.

**BALAX, INC.**, a corporation of Wisconsin, and **John Van Vleet**, an individual, Defendants.

No. 64–C–170.

United States District Court E. D. Wisconsin.

Sept. 9, 1968.

See also D.C., 43 F.R.D. 368.

John R. Collins, Foley, Sammond & Lardner, Milwaukee, Wis., Daniel C. Mc-Eachran, Parker & Carter, Chicago, Ill., for plaintiffs.

S. Lawrence Wheeler, Milwaukee, Wis., for defendants.

## OPINION ·

MYRON L. GORDON, District Judge.

The plaintiffs have charged the defendants with infringement of U. S. Patents Re. 24,572 and 3,050,755. In addition, the defendants are charged with appropriation and use of plaintiffs' trade secrets. The original plaintiff was Besly-Welles Corporation, an Illinois corporation. The defendants are Balax, Inc., a Wisconsin corporation, and John M. Van Vleet, an individual and a resident of Wisconsin. The court has jurisdiction under the patent laws of the United States.

After the suit was commenced, the assets of Besly-Welles were acquired by the Bendix Corporation, and the name was changed to Sellew Corporation. A new corporation, Besly-Welles, was also organized under the laws of the state of Delaware; all of the assets and patents of Sellew were transferred to this new company. The court will refer to the plaintiffs collectively as Besly.

The defendants have alleged, in addition to non-infringement of each patent, that both are invalid for several reasons. The individual liability of Van Vleet is denied. The defendants also have entered a counterclaim charging the plaintiffs with violation of the antitrust laws.

Both patents in suit relate to a device known as a fluteless swaging tap. The reissue patent (Re. 24,572) covers the tool itself and the 3,050,755 patent is concerned with the method performed by the tool. The tools involved in this litigation are used to form internal threads in metal. A common use would be to form the internal threads in a nut so that a bolt may be inserted. Prior to the development of the particular type of tool in suit, devices known as cutting taps were used to carry out this function.

The cutting or fluted type of tap actually removes portions of the metal to form the threads, whereas the taps in suit "swage" or displace the metal surrounding the hole into which the tap has been inserted. This method is said to be more economical and easier to perform. The taps have a longer life than cutting taps and there are no metal chips to remove when the job is completed.

Patent Re. 24,572 is a reissue of U. S. Patent 2,807,813. This tap has a shank and a threaded section. The threaded section has a cylindrical portion where the threads are substantially the same diameter and a tapered end portion where the threads are of reduced diameter. The threads have high spots or lobes with relieved areas in between these high spots. It is the lobes that do the actual swaging work since the relieved areas are out of contact with the material being formed. When used, the tool is rotated into a hole and the lobes force their way through the hole. The displaced metal takes the shape of the tap threads.

The '755 patent will also be referred to by the court as the method patent. The method of this patent is performed when the tool of the reissue patent is used in the prescribed manner. The method claims describe the application of pressure from the tap threads and the movement of the metal as it conforms its shape to that of the tap thread.

## PRESUMPTION OF VALIDITY

Every patent is presumed valid. The burden of establishing the invalidity of a patent rests with the party asserting it. 35 U.S.C. § 282. This statutory presumption "is only overcome by clear and cogent evidence of invalidity". Ortman v. Maass, 391 F.2d 677, 681 (7th Cir. 1968); Leach v. Rockwood & Co., 404 F.2d 652 (7th Cir. 1968). This presumption of validity has been attributed to the technical and legal expertise of the patent office. See Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630 (N.D.Ill.1966). However, this presumption can be weakened by introduction of prior art which was not before the patent office. Leach v. Badger Northland, Inc., 385 F.2d 193 (7th Cir. 1967); A R Inc. v. Electro-Voice, Inc., 311 F.2d 508, 512 (7th Cir. 1962).

## IS PATENT Re. 24,572 VALID?

The defendants attack the validity of the reissue patent under 35 U.S.C. § 102 (b).

"§ 102. Conditions for patentability; novelty and loss of right to patent

A person shall be entitled to a patent unless—

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or * * *."

The defendants have cited five prior references which are alleged to be anticipatory under the above section:

1. Three are German references, and they concern a tap produced by Ernst Reime. They are the Gebrauchsmuster (hereinafter referred to as GM), the Klepzigs Anzeiger and the Noris catalogue. It is claimed that the German references are anticipatory because the invention was patented and described in a printed publication in a foreign country.

2. The other two references are drawings and taps produced from those drawings by Pratt & Whitney and Detroit Tap & Tool. The defendants claim that the tools made by these two companies were in public use or on sale more than one year prior to the application for the reissue patent.

■■ Anticipation must be shown by clear and convincing evidence. The burden is on the party seeking to have the patent declared invalid. Illinois Tool Works, Inc. v. Continental Can Company, 273 F.Supp. 94 (N.D.Ill.1967), affirmed at 397 F.2d 517 (7th Cir. 1968). In the *Illinois Tool Works* Case, the trial court stated that the test of anticipation is framed in terms of identity between the prior device and the patented invention; that the disclosure in the prior art must be of a thing substantially identical with the claimed invention. The defense of anticipation was considered in

the recent cases of Shea v. Blaw-Knox Co., 388 F.2d 761 (7th Cir. 1968) and Amphenol Corporation v. General Time Corporation, 397 F.2d 431 (7th Cir. 1968). In the latter case, the court said:

"As a rule, in order to have anticipation, all of the elements of the patented device or their equivalents must be found in a single prior device. Firestone v. Aluminum Co. of America, 6 Cir. 1960, 285 F.2d 928, 930; Allied Wheel Products v. Rude, 6 Cir., 1953, 206 F.2d 752, 760. But it is sufficient if the general aspects are the same and the difference in minor matters is only such as would suggest itself to one of ordinary skill in the art. I Walker on Patents (Deller, 2d ed.) § 77 at page 363, citing Model Bottling Machinery Co. v. Anheuser-Busch Brewing Assn., 8 Cir., 1911, 190 F. 573, 579, cert. den. 223 U.S. 732, 32 S.Ct. 528, 56 L.Ed. 634."

In the *Illinois Tool Works* Case, the district court stated that it was not proper to combine various prior art references with regard to the defense of anticipation. As that court said on page 106:

"A patent or publication 'is to be measured as anticipatory, not by what might be made out of it, but by what it clearly and definitely discloses.'"

The court will therefore consider each of the prior references cited separately to see if any of them anticipates the reissue patent's subject matter.

■ The Gebrauchsmuster is a lesser type of German patent issued for petty or useful models and designs. There is no requirement of non-obviousness in order to obtain a GM, and its purpose is to enable the applicant to obtain speedy protection for a new article. After registration, the specifications and claims become available to the public. See Reeves Brothers, Inc. v. U. S. Laminating Corp., 157 USPQ 235 (E.D.N.Y.1968). It has been stated that a GM can be used as references as prior patents, but not as prior printed publications. Manual of Patent Examining Procedure, § 901.05

(b), 3rd ed. (Rev. Oct. 14, 1967). Since a GM qualifies for anticipation only as a foreign patent, its disclosure is limited to its claims, and its specifications cannot be used. The *Reeves* court discusses several cases in regard to the anticipatory effect of a GM and concludes as follows on page 250:

"▮ The Court concludes that for anticipation purposes under Section 102 a GM, which is a foreign patent but not a printed publication, is a reference only for what is patented, i. e., for what it claims and not for what is disclosed in its specifications. This is consistent with the language of Section 102(a) and (b) which juxtaposes 'patented \* \* \* in a foreign country' with the phrase 'described in a printed publication in \* \* \* a foreign country'. To permit the effect of such a foreign patent to extend beyond what is actually patented, would appear to indirectly effectuate a form of use and knowledge in a foreign country which is not statutorily allowable as an anticipatory reference to an American patent."

For a contrary position the defendants cite the case of American Infra-Red Radiant Co., Inc. v. Lambert Industries, Inc., 360 F.2d 977 (8th Cir. 1966); there the court used the GM as a reference for what was disclosed in its specifications as well as its claims. However, in that case, the GM was being used to invalidate a patent under 35 U.S.C. § 102(d) which relates to the invention having been patented by the applicant in a foreign country more than one year before filing for application in the United States. The court stated that if an applicant can use his foreign patent to obtain the benefit of an earlier filing date to establish its priority under 35 U.S.C. § 119, the applicant should also be subject to the disadvantages imposed under § 102(d). This court concludes that the holding of the *Infra-Red Court* as regards use of a GM as a prior reference is not applicable to the case at bar. The Reime GM shall be used by this court only for what is disclosed in its claims.

Claim 1 is the only real claim of the GM. Claim 2 incorporates by cross reference "the shape, disposition and arrangement reflected by the drawing and the specification." However, to allow such a cross reference would defeat the limited use which this court has concluded must be made of the GM.

Plaintiffs' expert, Mr. Fishleigh, compared claim 5 of the reissue patent with claim 1 of the GM. He testified and illustrated by a chart (PX 195) that elements 1, 2, 1a and 2a of claim 5 are not found in the GM. The court concludes that the test of substantial identity between the GM's subject matter and the subject matter of the reissue patent has not been met by clear and convincing evidence.

The first of the German publications is the Noris catalogue. This was put out by Ernst Reime. In regard to its disclosures, Mr. Fishleigh indicated with the same chart (PX 195) that the above elements of claim 5 are also not disclosed by the Noris catalogue.

The second German publication, the Klepzigs Anzeiger, contains an article about the Reime tap. Mr. Fishleigh testified that it had exactly the same disclosures as the Noris catalogue except for one element; he stated that element 1a of claim 5 was disclosed. This says that the pitch diameter of the thread on the cylindrical portion of tool is generally the same as the hole size into which the tool will be turned.

The defendants' expert, Mr. Spangenberg, was of the opinion that the foreign references did anticipate the subject matter of the reissue patent. However, his testimony shows that he considered all three references together. His position on each of the references separately is not known.

The defendants also offered the testimony of Mr. Gartner, an engineer for the Reime company, but the court is of the opinion that his testimony goes more to the question of obviousness under 35 U.S.C. § 103 than to the question of anticipation. It does not satisfy the stand-

ard of anticipation but could be used for what a person ordinarily skilled in the art would make out of the German references. This will be discussed later in this opinion.

■ The court concludes that the defendants have not met their burden of proof in showing that the GM, the Klepzigs Anzeiger or the Noris catalogue anticipate the subject matter of the reissue patent.

The defendants also rely on alleged prior use or sale of tools made by Pratt & Whitney and Detroit Tap as being anticipation of the reissue patent. It is claimed that both companies made and supplied swaging tools to Fisher Body Division of General Motors in 1950. This is more than one year prior to the application of the reissue patent which is entitled to the application date of patent 2,807,813 of which it is a reissue. The application for the parent patent was April 3, 1956.

In conjunction with the Pratt & Whitney tools, two documents are in evidence. These documents represent the drawings from which the tools manufactured in 1950 were made (DX 100 and 101). Also, two physical exhibits (DX 102 and 103) allegedly represent tools made by Pratt & Whitney from these drawings. However, it is not clear from this record that these two tools were actually made in 1950.

Regarding Detroit Tap, there are eight drawings in evidence (DX 264A, 265A, 266A, 267A, 268A, 269A, 270A and 271A). There are no physical exhibits which represent taps made by Detroit Tap in 1950, but the company at a later date made a tap which it is claimed was made pursuant to the last drawing in the series of eight (physical exhibit DX 272). This tap was supplied by Detroit Tap to both parties. In addition, plaintiffs' expert testified that he made taps pursuant to the above drawings (DX 100, 101 and 271A) and conducted experiments with them.

The plaintiffs characterize what Pratt & Whitney and also Detroit Tap were doing in 1950 as experimental. They maintain this because a relatively few orders of taps were sent to Fisher Body. These taps did not work out, according to the plaintiffs, and Fisher Body went back to using cutting taps. The defendants argue that both concerns were in the business of manufacturing and selling taps and that they were not experimenting.

In my opinion, Fisher Body was experimenting with swaging taps. The taps were sent to the "process development department" of Fisher Body by Pratt & Whitney and Detroit Tap. They were supplied only over a ten month period in 1950, and Detroit Tap furnished eight different models. After this, Fisher Body went back to using cutting taps.

While I believe that Fisher Body was experimenting with swaging taps, it does not necessarily follow that what Pratt & Whitney and Detroit Tap were doing was also experimental. Referring to subsection (b) of the statute, the court in George R. Churchill Co. v. American Buff Company, 365 F.2d 129, 134 (7th Cir. 1966) stated:

"A use involving public disclosure if not *solely* to test the qualities of the invention, and for the purpose of experiment, does not avoid the bar of the statute."

The court in Cloud v. Standard Packaging Corp., 376 F.2d 384, 390 (7th Cir. 1967) defined public use as follows:

"Except for purely experimental use, 'Public use may properly be defined as any utilization of the invention by one other than the inventor where the user is under no limitation, restriction or obligation of secrecy to the inventor.' "

■ A single public use is sufficient to render a patent invalid and the burden is upon the one asserting invalidity by prior public use to establish it by "clear, cogent and satisfactory proof to remove all reasonable doubt." McCullough Tool Company v. Well Surveys, Inc., 343 F.2d 381, 394 (10th Cir. 1965). See also De-

vex Corp. v. General Motors Corp., 321 F.2d 234 (7th Cir. 1963).

The defendants argue that the experimental use doctrine applies only to the inventor and cite in support of this position Monolith Portland Midwest Company v. Kaiser Aluminum Corp., 267 F. Supp. 726, 785 (S.D.Calif.1967). The *Monolith* court stated that the doctrine "applies to experiments conducted by the inventor to enable him to perfect his inventions before applying for a patent." However, this doctrine has been applied to those other than the inventor. See Kraft Foods Company v. Walther Dairy Products, 118 F.Supp. 1 (W.D.Wis.1954).

■ I believe that the experimental use doctrine should be applied to what both companies were doing. During the course of their dealings with Fisher Body in 1950, Detroit Tap supplied them with eight diferent models of swaging taps. Fisher Body apparently did not find that any of the tools were suitable for their purposes since they went back to cutting taps. The Pratt & Whitney orders were characterized as experimental (although the defendants state that this was to distinguish them from wholesale production). In addition, both of these concerns now buy their swaging tap requirements from the parties to this litigation. It is reasonable to conclude that both Pratt & Whitney and Detroit Tap were attempting to develop an operable swaging tap of commercial value. They failed.

Furthermore, the evidence establishes that the taps of both of these concerns do not measure up to the Besly tap. Mr. Fishleigh made and tested taps corresponding to the drawings of Pratt & Whitney and Detroit Tap. The results of his tests indicate that the Pratt & Whitney tap required two to three times the torque of the present Besly and Balax taps. The Detroit Tap tools required three to four times the torque. Mr. Van Vleet testified that a five percent difference in torque would be a difference he would be proud to obtain. Also, the prior taps would not work in stainless steel, which is a common material for swaging tap operation. It was Mr. Fishleigh's conclusion that the taps made in accordance with the drawings were not suitable for commercial use.

The defendants have not established by clear and convincing evidence that there was public use or sale under § 102(b).

■ As another attack on the validity of the reissue patent, the defendants rely on 35 U.S.C. § 103:

"§ 103. Conditions for patentability; non-obvious subject matter

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

Whereas § 102 is concerned with the novelty of the invention, § 103 offers a more practical test of patentability. The determination of "non-obviousness" is made after establishing the scope and content of the prior art, the differences between the prior art and the claims in issue, and the level of ordinary skill in the pertinent art. Graham v. John Deere of Kansas City, 383 U.S. 1, 12, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). This test for obviousness has been applied in many recent decisions. Ortman v. Maass, 391 F.2d 677, 680 (7th Cir. 1968); National Dairy Products Corp. v. Borden Co., 394 F.2d 887, 889 (7th Cir. 1968); Amphenol Corporation v. General Time Corporation, 397 F.2d 431 (7th Cir. 1968); U. S. Gypsum Co. v. National Gypsum Co., 387 F.2d 799 (7th Cir. 1967); Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630 (N.D.Ill. 1966).

The court has determined that the references cited by the defendants do not

anticipate the reissue patent under § 102, but this does not preclude their use under § 103. Monroe Auto Equipment Company v. Heckethorn Manufacturing & Supply Company, 332 F.2d 406 (6th Cir. 1964).

The defendants contend that the foreign references make the plaintiffs' tool obvious to one skilled in the art. For example, they maintain that anyone with such skill who looks at these references will see that the thread is of uniform depth throughout the circumference of the tap or that the lead portion is tapered.

The Noris catalogue (DX 203) at fig. 305 shows a "NORIS Machine taps 'No Shaving'." This tap is also discussed in the article in the Klepzigs Anzeiger and shown in fig. 3 of that publication (DX 201 and the translation DX 202). When asked what the Noris drawing disclosed to a person skilled in the art, Mr. Gartner replied, "Anybody who looks at this figure and knows anything about how threads are made sees from this figure how it operates." (tr. 774).

The defendants further argue that for the tap to enter the material to be threaded as is indicated in the above references, the lead portion must be tapered. The defendants say that this fact can be easily ascertained by simply placing a straight-edge along the tap in the drawings. Mr. Spangenberg, on cross-examination, admitted that the publications do not have any written description that the tap has a tapered end section.

With regard to the GM and the issue of obviousness, it is only the claims that can be referred to. As was stated in the *Reeves* Case, supra, at page 251:

"To treat the GM as a prior art reference under Section 103 for all it discloses would render the claims restriction of Section 102 meaningless because such treatment would accomplish indirectly what is proscribed directly. The legislative history of Section 103 makes clear that the term 'prior art' as used in that section refers only to 'what was known before as described in section 102' * * *. Therefore, the GM can be treated as a prior art reference under Section 103 only for what is claimed therein."

The specifications cannot be referred to, and, as was mentioned before, that is where Mr. Spangenberg targeted most of his testimony.

The testimony of neither Mr. Spangenberg nor Mr. Gartner convinces the court that the Besly patent is rendered invalid because the subject matter was allegedly obvious under the claims of the GM or the two German publications.

In Copease Manufacturing Company v. American Photocopy Equipment Company, 298 F.2d 772, 781 (7th Cir. 1961), the court stated:

"A novel combination of old elements which so cooperate as to produce a new and useful result or a substantial increase in efficiency is patentable."

One can overcome old elements by inventiveness. United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). It appears to the court that Besly has added inventiveness to whatever was disclosed in the Pratt & Whitney and Detroit Tap tools. The defendants have not convinced this court that the prior tools make the subject matter of the reissue patent obvious.

The commercial success of Besly tends to support the position that something novel was added to achieve the result they did. Nine prior arts were before the patent office, and there is no evidence that they achieved the commercial success that Besly and Balax did. The lack of commercial success of Pratt & Whitney and Detroit Tap has already been discussed. The plaintiffs have presented substantial evidence concerning the industrial acceptance of their tap. Stephen Cowell, a tool representative of the Ford Motor Company, stated that the Besly tap was new and revolutionary. Testimony of various tap manufacturers was offered to illustrate the advantages that the Besly swaging tap has over the cutting tap. The industrial acceptance of the swaging tap also indicates the

long-felt need there was for a tap that functions more economically and efficiently.

It has been held that commercial success bolsters the validity of a patent. P & D Sales & Mfg. Company v. Winter, 334 F.2d 830 (7th Cir. 1964). However, success in the market place is to be taken only as a secondary factor in evaluation of the patent's validity. This is because there may be factors other than the novelty or non-obviousness of the invention which result in commercial success. Dymo Industries, Inc. v. Com-Tech, Inc., 391 F.2d 335 (7th Cir. 1968). The court is of the opinion that the commercial success of the Besly tap helps to illustrate the novelty, non-obviousness as well as the utility of the subject matter of the reissue patent.

### U.S. PATENT No. 3,050,755 IS INVALID

■ The defendants also challenge the validity of the method patent under § 102(b). They contend that the method was in public use for more than one year prior to the application for this patent. The defendants say that the method was in public use by means of sales to plaintiffs' customers which began June 13, 1956. The plaintiffs acknowledge that this is when sales of the Besly tap began. They also admit that the Besly tap will inherently practice the method claims of the '755 patent. Application for the method patent was not made until July 23, 1958. Plaintiffs' answer to this contention of the defendants is that the method claims were first disclosed in patent 2,807,813 and the '755 patent should have the benefit of the former's filing date, which was April 3, 1956. The plaintiffs attempt to show that the initial disclosures in application for 2,807,813 were carried over to '755.

35 U.S.C. § 120 reads as follows:

"120. Benefit of earlier filing date in the United States

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."

This section gives a patent application the benefit of an earlier filing date if three basic requirements are met: 1) co-pendency of application; 2) cross-reference to the earlier application; and 3) continuity of disclosure. Illinois Tool Works, Inc. v. Continental Can Company, 273 F.Supp. 94 (N.D.Ill.1967).

The plaintiffs present the following sequence: On April 3, 1956, application 575,733 was filed (this resulted in patent 2,807,813). On September 26, 1957, application 686,521 was filed and this application was co-pending with the former application (686,521 was later abandoned). While the second application was still pending, application 750,377 was filed on July 23, 1958 (this resulted in the '755 patent). The plaintiffs maintain that the entire disclosure of the first application was carried over to the second which, in turn, was carried over to the third.

The defendants' position is that the first application, 575,733, contains tap claims only. They say that the first disclosure of method claims was in the application for the method patent. As concerns the second application, 686,521, the defendants state that it initially did not contain method claims, but that such claims were added at the same time the method patent application was filed. They say that this is after 686,521 had received final rejection and just before it had been abandoned. The defendants base their position on Mr. Spangenberg's study of the pertinent applications and

file wrappers. (DX 425, 426 and 427 illustrate his conclusions).

The threshold question is whether the 575,733 application discloses the method claims. If it does not, then the method patent is invalid because of prior public use under § 102(b). As mentioned before, the tap disclosed in application 575,733 will inherently practice the method claims. The plaintiffs contend that the mere disclosure of a device which inherently performs a function in a patent application also by necessity discloses that function, and that the application may be amended later to recite the function without introducing prohibited new matter. Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630 (N.D.Ill.1966).

In addition to their contentions of no disclosure, the defendants also maintain that the method claims are merely a function of the tap itself and therefore cannot be patented. The defendant in the case of Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733 (1935) argued a similar position, and the court said that a method is not to be rejected as functional merely because the specifications show a machine capable of using it. In the case at bar, on two different occasions, as pointed out by the plaintiffs, the patent office said that the method claims were to be separate from the claims regarding the tap itself.

The first of these occasions can be found in the 686,521 file wrapper (PX 108). On January 23, 1958, the patent office made a final rejection of the application. In response to that rejection, inventor Welles added claims 15 and 16, which were method claims. On page 24 of the file wrapper, the patent office states the following with regard to the newly added claims:

"The newly proposed claims are drawn to a method and therefore are to an invention distinct from and independent of the invention previously claimed. Therefore the claims and the amendment cannot be considered by the examiner."

On the other occasion, Mr. Welles, in his oath of May 28, 1958, during the prosecution of the reissue application (PX 68), stated that he intended the original patent to include method claims because one aspect of his invention was the material working method. The patent office, at page 27 of the file wrapper, recognized that the method claims would relate to a separate invention:

"The several inventions are distinct each from the other because the method as defined by the claims of Group II can be practised by an apparatus differing materially from that defined by the claims of Group I."

These statements of the patent office indicate that the method claims do indeed embody a separate and patentable invention from that of the tap claims. The method should not be rejected as merely functional and therefore unpatentable.

35 U.S.C. § 120 states that the invention must be disclosed in the manner provided for in the first paragraph of § 112, which reads as follows:

"The specifications shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

The following description as to how the tool described is to be used is found in patent 2,807,813:

"In practice, my improved form of fluteless tap is preferably introduced in a previously bored hole 19 of a workpiece indicated at 20, which hole is of substantially the same diameter as the final pitch diameter of the thread as indicated in Figures 1 and 5. The tap is then rotated so as to screw it into the hole. The internal threads are formed by displacing the metal with a swaging action, as illustrated in an

exaggerated diagrammatic manner in Figure 5. It has been demonstrated that due to the novel form of the tap thread with its radial relief, an interior thread may be produced in the work with greater ease, and with much less torsional effort and generation of heat, than with a tap of corresponding size without the radial relief which characterizes my invention."

This language remains unchanged from that initially placed in the application (see PX 70 at pages 3 and 4). The method patent is known as the "method of forming threads by applying sliding pressure." When the description above and the whole of the 2,807,813 patent are compared with the method claims expressed in '755, it becomes reasonably clear that the disclosure of the original patent does not satisfy the requirements of § 112.

Mr. Spangenberg in DX 430 points out portions of the '755 patent claims which are missing in previous applications. The patent office considered the method claims in application 686,521 and in the application for the reissue patent as independent of the invention claimed originally. Granted, disclosures in specifications are not to read identically with claim language, but considering all the above factors, it is difficult for the court to agree with the plaintiffs' position on the disclosures of the 2,807,813 patent.

■ The method patent cannot receive the earlier filing date by virtue of the operation of § 120. Sales of plaintiffs' taps which would practice the method began June 13, 1956. The first satisfactory disclosure of method claims appeared more than one year after this, thus making the method in public use more than one year prior to application for the method patent. Therefore, I believe that the method patent is invalid.

The court has determined that the German references do not anticipate the tap under § 102(b). It is even clearer that they do not anticipate the method.

Likewise, it is the opinion of this court that the tools made by Pratt & Whitney and Detroit Tap do not anticipate the method. Here, the lack of their efficient operability bears even greater weight on the question of anticipation.

The court duplicates these findings on the question of obviousness under § 103. None of the prior references relied on by the defendant establish by clear and convincing evidence that the method patent should be invalid for lack of non-obviousness.

## THE BALAX TAP INFRINGES UPON THE CLAIMS OF Re. 24,572

■ The basic test for patent infringement was set down in Graver Tank & Mfg. Company, Inc. v. Linde Air Products Company, 339 U.S. 605, 70 S. Ct. 854, 94 L.Ed. 1097 (1950). The court stated that an accused device can infringe in two ways, either literally by falling clearly within the words of the claim, or by the doctrine of equivalents:

"* * * 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' "

Graver, supra at 608, 70 S.Ct. at 856. See also Ortman v. Maass, 391 F.2d 677, 682 (7th Cir. 1968).

In the instant case, the accused device does not fall clearly within the words of the claim. Therefore, the plaintiffs must make out a case for infringement pursuant to the doctrine of equivalents. Whether or not the accused device infringes upon the patented tap centers around one area of conflict—the Balax tool does not have a continuous thread. Claim 5 of the reissue patent states that the device is "A fluteless thread forming tool for threading a generally cylindrical surface, the tool having a cylindrical portion with a continuous thread * * *" The Balax tap does not have such a thread because of its axially extending groove.

The plaintiffs state that the word "continuous" is in the claims to distinguish a swaging tap from a cutting tap. Cutting taps have flutes which provide a cutting edge and a reservoir for chips from the metal being cut in addition to providing a means for carrying lubricant to the working area.

Mr. Fishleigh testified on the basis of his comparative tests between the Besly and Balax tools that the latter's groove does not perform the first two functions of a flute on a cutting tap; it does, however, perform the function of carrying lubricant to the working area. It does not have an effect on the working of the tap since it is found in the relieved area of the tap. Mr. Fishleigh's tests also negate any alleged advantages of this groove. It does not lower the torque nor does it prevent high pressure buildup underneath the tap. Mr. Fishleigh's test illustrates no difference in torque between the two taps and only a slight pressure buildup differential. Mr. Fishleigh concluded that the Balax tap does substantially the same work and achieves substantially the same result as the Besly tap.

█ It is the conclusion of this court that the Balax tap is the equivalent of the Besly tap; the groove's presence does not prevent infringement.

█ The doctrine of equivalents does not operate, however, where there is file wrapper estoppel. This occurs where the patentee in the course of prosecuting his application inserts limitations to escape a prior art. Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630 (N.D. Ill.1966). These limitations must be given recognition when infringement is charged. Simmons Company v. A. Brandwein & Company, 250 F.2d 440 (7th Cir. 1957). An invention is construed not only in light of the claims, but also with reference to the file wrapper or prosecution history in the patent office. A narrowed claim can no longer cover what was previously eliminated. Graham v. John Deere Company of Kansas City, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). See also Dixie Cup Company v. Paper Container Mfg. Company, 169 F.2d 645 (7th Cir. 1948).

The defendants claim that file wrapper estoppel should apply to the word "continuous". They contend that this limitation was added to overcome rejections based on prior art. In addition, there is a conflict as to what is meant by the following language of claim 5:

" * * * the threaded end portion being a noninterrupted continuation of the continuous thread on the cylindrical portion."

The defendants interpret this as meaning that there must be non-interrupted continuous threads on the threaded end portion of the tap. The plaintiffs interpret this as meaning that the end portion is threaded and is a continuation of the cylindrical portion which is also threaded, i. e., there is no interruption between the threads on the one and the threads on the other.

█ As concerns the word "continuous", the plaintiffs maintain that this word has always been in the claims of the original and the reissue patent; that it was not put in to overcome rejection based upon a prior art. An inspection of the file wrapper of patent 2,807,813 (PX 70) shows that this word has always been in the claims. Several amendments were made before allowance was given to this application, but none had to do with the threads' continuity. The attorney of record did, however, argue that the device was distinguished from some of the prior art because of its continuous thread. But these statements or arguments of an attorney during the prosecution of the patent application do not create file wrapper estoppel. This is because the patentee did not have to add the word "continuous" to his claims to overcome objections based on prior art. See University of Illinois Foundation v. Block Drug Company, 133 F.Supp. 580 (E.D. Ill.1955); York Ice Machinery Corp. v.

L. & K. Ice Corp., 6 F.Supp. 544 (S.D. N.Y.1934).

In regard to the disputed claim language of claim 5, it was added to the reissue claims after final rejection. The attorney of record states that this amendatory change was suggested by the examiner. (PX 68 at page 42). A study of the file wrapper of the reissue patent does not show that any of the amendments, including the above, that were made to overcome objections based on prior art, involved the continuity of the thread or the fact that the threaded end portion is a "non-interrupted continuation of the continuous thread on the cylindrical portion." The rejections before final allowance were based on items such as full thread depth on the tapered end portion, uniformity of the thread depth on the cylindrical portion, and the relationship of the diameter of the surface to be threaded with the pitch diameter of the threads on the cylindrical portion.

As to the meaning of the language in claim 5, it should be noted that a patentee is his own lexicographer. The terms he uses should be interpreted to read upon the structure he describes in the patent. Canaan Products, Inc. v. Edward Don & Company, 388 F.2d 540 (7th Cir. 1968). The defendants take their interpretation because certain prior art cited to the patent office, Barth no. 2,703,419 and De Lapotterie no. 1,676,-482, showed an interruption of threads in areas where no work was performed. As mentioned above, the court does not conclude that this language was added to overcome objections based on prior art, including the Barth and De Lapotterie patents. Since the defendants base their interpretation of the language of claim 5 on the assumption that file wrapper estoppel applies, their interpretation cannot be accepted.

It is the conclusion of this court that the language of claim 5 shall be given the interpretation the plaintiffs place upon it. It is the further con-clusion of this court that the doctrine of file wrapper estoppel is not applicable and therefore the claim language of the reissue patent does not have to be strictly construed. In light of what has been concluded by this court in regard to the doctrine of equivalents, the Balax tap does infringe upon the subject matter of the reissue patent.

## PATENT 3,050,755 IS IN-FRINGED BY THE BALAX TAP

Even though the court has concluded that the method patent is invalid, an evaluation will be made as to its being infringed by the defendants' tap.

There are two areas where the defendants try to distinguish the operation of their device from the method claims. One is that the accused device does not have its areas of pressure application equally spaced exactly 90 degrees apart. The other results from an interpretation of the language of claims 1 and 3:

"* * * the areas in the second series all being disposed in the same helical path and being substantially the same in size and pressure intensity and being substantially equal to the last such pressure area in the first series."

The reason the high spots on the Balax tap are unequally spaced is to make room for the groove. However, Mr. Fishleigh opined that the unequal spacing makes no difference in the operation of the Balax tap as compared to the Besly tap. Defendants' expert has never used the accused tap, and he could not contradict this finding. In fact, the court is of the opinion that the defendants have not offered any testimony that will dispute Mr. Fishleigh's findings on this point. It was the conclusion of this court that the presence of the groove did not prevent the accused tap from infringing on the reissue claims. Since the only reason there is unequal spacing of the lobes is to make room for the

groove, the court concludes that this unequal spacing does not prevent the accused tap from operating in a manner that infringes on the method claims.

As to the disputed language of claims 1 and 3, the defendants interpret this as meaning that each of the threads on the cylindrical portion of the tap is equal in pressure intensity to the last pressure area on the lead section of the tap. The defendants state that only the first lobe on the cylindrical portion does any work and that it does less work than the last thread on the tapered lead section. The defendants assert that it is impossible for the successive threads on the cylindrical portion to apply the same pressure as the last thread on the lead portion since the cylindrical portion does no work.

The plaintiffs agree that the threads on the cylindrical portion, except for the lobe on the first thread of that section, do not do any work. As stated in column 2, lines 47–50 of the specifications of the method patent:

"In a sense, the majority of the maximum area 13 [the cylindrical section] floats or rides through after the work is done by the tapered portion 14, 15 and 16 and the first turn or so of the maximum area 13."

The plaintiffs contend that the claim language means, in light of the specification, that the pressure areas in the cylindrical section are equal in size and in pressure-applying *ability* as the last lobe on the tapered section. They say that this does not mean that all the threads on the cylindrical section actually apply the same pressure as the last lobe on the tapered section.

The defendants maintain that the claim language specifically says that the threads on the cylindrical portion do in fact apply the same pressure.

As stated earlier in reference to the *Canaan* Case, supra, a patentee is his own lexicographer, and the terms he uses should be interpreted to read upon the structure he describes in the patent. Also, while the claims define the invention, the specifications may be used to explain any ambiguity in those claims. The claims are to be read in light of the specifications, and both are to be read with a view to ascertaining the invention. See Minnesota Mining and Manufacturing Company v. Technical Tape Corp., 309 F.2d 55 (7th Cir. 1962); Scherbatskoy v. United States Steel Corp., 287 F.2d 552 (7th Cir. 1961).

The defendants place an interpretation on the claim language which they say results in a physical impossibility. They say that since taps do not operate in this manner, their tap does not; and therefore their tap does not infringe upon the method claims. The court reads the claims in light of the specifications. The specifications indicate that only the first turn or so of the threads on the cylindrical portion do any work. Therefore, when the claims state that the areas in the second series are substantially the same in size and pressure intensity to the last such pressure area in the first series, this must mean that their pressure-applying ability is the same, not the pressure which they actually apply. To give this language a contrary meaning would not be in accord with the way the specifications describe the method the tap uses.

In applying the doctrine of equivalents, I conclude that the claims of the method patent find a response in the method performed by the Balax tap.

## THERE IS NO WILLFUL AND WANTON INFRINGEMENT BY THE DEFENDANTS

The plaintiffs have asked for treble damages and for the awarding of reasonable attorneys fees. This is provided for in 35 U.S.C. §§ 284 and 285. For such an award the court must find exceptional circumstances. The plaintiffs say such exceptional circumstances are present because the defendants have

willfully and wantonly infringed upon the patents in suit. If infringement of this type is found, the court, in its discretion, may award treble damages and reasonable attorneys fees. Union Carbide Corp. v. Graver Tank & Mfg. Company, Inc., 282 F.2d 653 (7th Cir. 1960); Upjohn Company v. Italian Drugs Importing Company, 190 F.Supp. 361 (S.D. N.Y.1961).

The court in the *Upjohn* Case states that such awards are to be made sparingly and usually only where a clear showing of deliberate infringement is made. The plaintiffs cite the case of Maxon Premix Burner Company, Inc. v. Mid-Continent Metal Products Company, 155 USPQ 434 (N.D.Ill.1967), for factors upon which a finding of an absence of good faith on the part of the infringing defendant can be made. In the *Maxon* Case, the court found that the defendant had literally infringed upon the claims of the patented device.

The plaintiffs point out that the reissue patent was issued almost four years before the defendants' swaging taps appeared on the market in 1962. It is also a fact that Mr. Van Vleet received certain information concerning the plaintiffs' taps in 1961. During that same year, Mr. Van Vleet was negotiating for a licensing arrangement with the plaintiffs (PX 143) so that he knew of the Besly patent. On the other hand, the defendants point out that they were relying on the advice of counsel and cite a letter from their attorney to plaintiffs' attorney (DX 237). The plaintiffs take issue with the conclusion which the defendants draw from this letter.

The court has found that the defendants' accused device infringes on both patents in suit, although the '755 patent has been held to be invalid. The infringement was based upon the doctrine of equivalents. The court is also of the opinion that the issue of infringement was clearer to resolve than the issue of validity. This is illustrated by the fact that the court held the ques-

tion to be sufficiently close so that the secondary considerations of commercial success were referred to.

The court in the *Upjohn* Case, supra, at page 367 said:

"There must be a deliberate purpose to infringe and such a purpose is not found where the validity of the patent and any possible infringement is open to honest doubt."

It is the court's opinion that the defendants have been in good faith in questioning the validity of the patents in suit. Furthermore, the court does not deem it bad faith for the defendants to have manufactured and sold the accused device which basically differed only in that it had a groove. Since the court did not find file wrapper estoppel, a strict construction was not put on the claim language referring to a "continuous" thread, but this does not mean that the defendants were not acting reasonably in relying on this language.

There is a gap between infringement and willful and wanton infringement and the plaintiffs have not satisfactorily spanned this gap. I find that the plaintiffs have not sustained their burden of proof in establishing the exceptional circumstances called for. Their request for treble damages and reasonable attorneys fees under §§ 284 and 285 must be denied.

## HAVE THE DEFENDANTS APPROPRIATED THE PLAINTIFFS' TRADE SECRETS?

In addition to their charges of infringement, the plaintiffs have alleged that the defendants have appropriated Besly's trade secrets. This issue of unfair competition is based upon diversity of citizenship which exists in the case at bar. State law is to be used in determining the issue. Bliss v. Gotham Industries, Inc., 316 F.2d 848 (9th Cir. 1963); Smith v. Dravo Corp., 203 F.2d 369 (7th Cir. 1953); Solo Cup Company v. Paper Machinery Corp., 240 F.Supp. 126 (E.D.Wis.1965). Ac-

cording to the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the state law upon which to base the plaintiffs' right of recovery is the law of Wisconsin.

The Wisconsin law has recently been set down in Abbott Laboratories v. Norse Chemical Corp., 33 Wis.2d 445, 147 N.W.2d 529 (1967). The Wisconsin court stated that they believed that the Restatement of Law correctly stated the general law of trade secrets. Referring to the Restatement, the court found that two elements were essential in establishing a cause of action: an actual trade secret and breach of confidence. Among the factors to be considered in determining whether given information is a trade secret, the court listed the following, at pages 463–464, 147 N.W.2d at pages 538–539:

(a) The extent to which the information is known outside of his business;

(b) the extent to which it is known by employees and others involved in his business;

(c) the extent of measures taken by him to guard the secrecy of the information;

(d) the value of the information to him and to his competitors;

(e) the amount of effort or money expended by him in developing the information;

(f) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Both sides have set out in their briefs what they believe the pertinent facts to be in resolving this issue. The plaintiffs contend that they supplied the defendants with confidential information, and that the defendants put this information to use; that this information enabled the defendants to enter the swaging tap business by a shortcut. The defendants, on the other hand, maintain that they received no information from the plaintiffs which was confidential, and that at no time did they use the in-

formation that the plaintiffs supplied to them.

Have the plaintiffs satisfied the factors of the *Abbott* Case? The court will examine the items enumerated in that case:

(a) The information is not known to a great extent outside of Besly's business. The testimony indicates that Besly supplied similar information only to its licensees. Mr. Van Vleet testified that some of this information can be found in "Standards and Dimensions for Taps and Dies". (PX 176). But the testimony of one of plaintiffs' engineers contradicts Mr. Van Vleet. This employee stated that the information in the standards book does not apply to swaging taps. (Tr 524).

(b) The plaintiffs have not shown the extent to which this information is known by its employees and others involved in Besly's business.

(c) Similarly, the plaintiffs have not demonstrated the extent of any measures taken by them to guard the secrecy of the information; they say, however, it is not the type of information that they would divulge to a competitor.

(d) The testimony indicates that this information does have value to Besly and its licensees. Plaintiffs claim that it had great value to the defendants because the latter used it as a shortcut to get into the swaging tap business. The record shows that the defendants had not produced a swaging tap before the visits to Besly. (Tr 316). But the evidence also shows that when the plaintiffs visited the Balax plant in 1965, they found very little in common between the two operations. (Tr 824).

(e) The testimony discloses that it took great effort to develop the information. It was stated that it would take one man working full time a year to develop identical information. (Tr 522).

(f) This latter statement also applies to the difficulty with which this information could be properly acquired or developed by others.

■ Defendants contend that the plaintiffs did not supply them with all the information which the latter claim was furnished. Nevertheless, this court is of the opinion that the information that was in fact supplied may properly be characterized as an actual trade secret.

The next question to be answered is whether a confidential relationship existed between the parties. The plaintiffs allege that they did not view Mr. Van Vleet as a competitor; that he told them that he was only interested in manufacturing and leasing machines that could produce taps. Mr. Van Vleet states that he conveyed the impression to Besly that he was in the tap business.

Mr. Van Vleet believed that he could produce a tap superior to the plaintiffs'. The tests made by the plaintiffs at a later date disclosed that Mr. Van Vleet's improvements in regard to lead error did not actually alter the tool's operation. However, this does not warrant the conclusion that Mr. Van Vleet used the alleged improvements as a guise to get information out of Besly. The record does not disclose any adequate precautions taken by Besly to protect the secrecy of the information they were giving Mr. Van Vleet; they say that the parties entered into a "joint venture", but there is not sufficient testimony to establish this. At best, the record discloses that both parties felt that they could help each other (PX 121).

■ It is the court's opinion that the plaintiffs should have regarded Mr. Van Vleet as a potential competitor. The plaintiffs did not take reasonable precautions which would prevent him from becoming a competitor if a satisfactory arrangement could not be worked out with Besly. Viewing Mr. Van Vleet as a potential competitor, the plaintiffs should have taken steps to insure the confidentiality of the information given to him. The plaintiffs have failed to demonstrate that a confidential relationship existed or was contemplated by the par-

ties. Therefore, the plaintiffs have not sustained their burden of proof that the defendants appropriated trade secrets.

## IS THE COMPANY PRESIDENT PERSONALLY LIABLE FOR INFRINGEMENT?

The plaintiffs seek to hold Mr. Van Vleet personally liable for the infringement of the patents in suit. Balax was incorporated in 1959, and Mr. Van Vleet has been its president since then. Initially, Mr. Van Vleet was the only stockholder, and at present he owns 63 percent of the stock. (Tr 268). Until 1964, there were only three corporate officers of Balax. At that time, Mr. Dobrogowski was employed by the board of directors. His duties are similar to those of Mr. Van Vleet. (Tr 292). This includes engineering, design, research and development of products. It was Mr. Van Vleet who designed the accused structure. (Tr 269). He was also the person who was in contact with the Besly people during the 1961 period when certain information was obtained from Besly. The plaintiffs contend that the record supports a finding that Balax was Mr. Van Vleet's alter ego.

The defendants state that Balax is a corporation in which many people have money invested; that it is run by an active board of directors; and that Mr. Van Vleet did not take any of the management responsibility away from this board.

The plaintiffs urge that every requirement of Rex Chainbelt, Inc. v. General Kinematics Corp., 363 F.2d 336 (7th Cir., 1966), has been met for holding Mr. Van Vleet personally liable. That case did not purport to set out a list of general requirements for finding personal liability; the court simply listed factors which supported that finding. It appears that some of those same factors can be found in the instant case. However, the record in this case shows that the board of directors does have a hand in the management of Balax. The corporation and Mr. Van Vleet are not one

and the same, even though because of his majority stockholding and the relatively small size of the organization, Mr. Van Veet is a most integral cog.

■ I conclude that Mr. Van Vleet is not hiding behind "the corporate veil". The record does not support a finding that Mr. Van Vleet should be held personally liable for the infringement of the patents in suit.

## DID THE PLAINTIFFS PERPETRATE A FRAUD ON THE PATENT OFFICE?

■ One of the several defenses which the defendants interposed in this lawsuit is that the plaintiffs obtained the patents by committing fraud on the patent office. This is the "spectre of unclean hands" which Judge Swygert referred to in National Dairy Products Corp. v. Borden Co., 394 F.2d 887, 891 (7th Cir. 1968). The defendants have the burden of proving this by clear and convincing evidence. Armour & Company v. Wilson & Company, 274 F.2d 143, 148 (7th Cir. 1960).

The defendants claim that inventor Welles filed affidavits with the patent office which, contrary to his knowledge, claimed that the subject matter had not been in public use or on sale more than one year prior to his applications. The defendants contend that Welles knew of the German publications, plus the Pratt & Whitney and Detroit Tap sales at the time the reissue patent was applied for. In regard to the '755 patent, the defendants claim that Mr. Welles failed to inform the patent office of sales to Besly's customers more than one year prior to the date of the application.

To support their contentions, the defendants cite the testimony of Warren Olson, president of Besly. Mr. Olson testified that about 1955–56, during the course of general meetings, he heard about certain companies and about sales to Fisher Body. These companies were Ernst Reime, Pratt & Whitney and Detroit Tap. He states that he probably got this information from either Mr.

Welles or Mr. Addoms. The plaintiffs date such conversations around October 1958.

■ The court believes that Mr. Olson did indeed hear something about these companies at the time he testified that he did; however, his testimony is inconclusive as to exactly what he heard, and even more inconclusive as to what knowledge can be attributed to Mr. Welles during this period. This is not clear and convincing evidence of fraud on the patent office.

The court has also considered the evidence as to what Mr. Olson told the patent office in his oath of July 23, 1959; he there stated that the initial promotion of the tap in suit began in January, 1958, but that there were a few previous sales incident to experimentation that were not significant. (PX 72 at page 49). A chart of average sales was appended which shows no 1957 or 1956 sales.

The defendants have not persuaded the court by clear and convincing evidence that the plaintiffs obtained the '755 patent by means of fraud.

## ARE THE PLAINTIFFS NOT ESTOPPED BY LACHES?

The defendants maintain that the plaintiffs are barred by laches as regards their charges of patent infringement and trade secret appropriation. The defendants contend that it was almost two years after they were first notified of the charges that plaintiffs brought suit.

On April 20, 1962, Besly charged defendants with patent infringement. (DX 234). The complaint in this action was filed on June 17, 1964. However, on May 24, 1962, Besly filed an infringement action against Jarvis Corporation. (PX 9). Mr. Van Vleet learned about this suit which involved the patents in the instant action in March or April of 1963. (Tr 1194).

■ ■ In Armstrong v. Motorola, Inc., 374 F.2d 764 (7th Cir. 1967), the court noted that a suit pending to sustain the validity of a patent is notice to all infringers of the insistence by the pat-

**348**

entee upon his claimed rights. The defendants knew of the Jarvis lawsuit, and therefore they should have known that Besly was insisting upon the rights it claims from the patents in suit. The suit against Jarvis was filed after Besly had notified the defendants in the instant case of its charges of infringement.

Upon the facts of the case at bar, the plaintiffs are not barred from maintaining this suit against the defendants.

### HAVE THE PLAINTIFFS VIOLATED THE ANTI-TRUST LAWS?

The defendants have counterclaimed averring that the plaintiffs have violated sections 1 and 2 of the Sherman Act. Treble damages are sought under section 4 of the Clayton Act. In my opinion, this counterclaim may not succeed because (1) there was no adequate proof of fraud in procuring the patents in suit, (2) the plaintiffs are not properly chargeable with illegal enforcement of their patents, and (3) there has been no sufficient showing of an illegal combination to restrain trade.

By dint of its valid patent Re. 24,572, the plaintiffs were entitled to the limited protection afforded under the patent laws. This included the right to license others to manufacture the patented tap. It is inappropriate to denominate this conduct as "conspiratory" or "monopolistic". United States v. Masonite, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1941) is not applicable.

In my opinion, there is no merit to the defendants' counterclaim.

### CONCLUSION

The foregoing opinion constitutes this court's findings of fact and conclusions of law in accordance with rule 52(a), Federal Rules of Civil Procedure.

Counsel for the plaintiffs are requested to prepare an order in accordance with the foregoing opinion. Said order may be presented to the court for signature but not before the same has been in the hands of defendants' counsel for at least ten days.