William S. CLOUD et al., Plaintiffs-Appellees and Appellants,

v.

STANDARD PACKAGING CORPORATION, Defendant-Appellant and Appellee.

Nos. 15129, 15130.

United States Court of Appeals Seventh Circuit.

April 13, 1967.

Charles F. Meroni, J. Arthur Gross, Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., for plaintiffs-appellees-cross-appellants.

Stuart S. Ball, Chicago, Ill., Dana M. Raymond, New York City, for Standard Packaging Corp., Sidley, Austin, Burgess & Smith, Chicago, Ill., Brumbaugh, Free, Graves & Donohue, New York City, of counsel.

Before HASTINGS, Chief Judge, and KILEY and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Action for injunction against and damages for infringement of patents and exploitation of information concerning an invention, confidentially acquired, and for assignment of a patent based on such information.

Speaking generally, the case relates to methods and machines, for vacuum packaging food, by which pockets are successively created in one strip of stretchable plastic film, and after insertion of food in each pocket, it is covered by and sealed to another strip of film, and air is evacuated from the pocket.

Plaintiffs William Cloud and others are the owners of, or otherwise interested in, three patents. Defendant Standard Packaging Corporation is the alleged infringer of plaintiffs' patents, and the owner of a patent allegedly based on information confidentially acquired. (There was diversity, as well as patent, jurisdiction.)

Plaintiffs' patents in suit are:

Pfeiffer '760: No. 2,486,760, issued November 1, 1949

Cloud '059: No. 2,546,059, issued March 20, 1951

Cloud '787: No. 2,888,787, issued June 2, 1959

Issues originally pleaded with respect to other patents are no longer in the case.

Defendant's patent which plaintiffs seek to have assigned to them is Mahaffy '828: No. 2,935,828, issued November 1, 1960.

The district court, after making detailed findings, rendered judgment that Pfeiffer '760 is valid (though not infringed); that Cloud '059 and Cloud '787 are valid and certain claims thereof have been infringed by defendant by its machines 6–12 and 6–16, but not 6–14; that plaintiffs' cause of action for unfair competition is without merit and is dismissed. The judgment awarded an injunction and an accounting.

Defendant appealed from the determination that Pfeiffer '760 is valid and that Cloud '059 and '787 are valid and infringed by machines 6–12 and 6–16, and from the award of relief. Plaintiffs appealed from the determination that Cloud '059 was not infringed by machine 6–14, from the dismissal of the cause of action for unfair competition and from the denial of relief in those respects.

The facts will appear in the discussions of the several issues on the appeal.

1. *Unfair competition.* The district court described this issue as follows:

"whether there was any joint venture or confidential relationship between defendant and plaintiffs or any wrong-doing in the nature of betrayal of trust by defendant attending or following the inspection on April 7, 1955, by defendant's engineer, Reid Mahaffy, of the Cloud vacuum packaging process and machine then located at the Ostrow plant in San Francisco and described in the Cloud '787 patent that was applied for more than eighteen months later on January 11, 1957."

Portions of the findings relevant to this issue are as follows:

"72. During the early 1950's and prior to 1955, defendant was the acknowledged leader in the field of flexible vacuum packaging and its vacuum packaging materials and machines were in wide use throughout the country.

"73. In 1951, defendant was considering the feasibility of vacuum packaging luncheon meat in 3–D packages using an automatic vacuum packaging machine. The 3–D package then under consideration was substantially the same shape and size as the packages presently made on defendant's 6–12 machine.

"74. The project which ultimately resulted in defendant's 6–12 prototype machine was begun in 1953 and assigned Project No. 221–53–060.

"75. In 1954 defendant developed a Mylar-polyethylene packaging film for use in packaging luncheon meats and other food products. This film was available to defendant's customers in pouch form prior to April of 1955 and this composite film, as modified and improved from 1955 to 1957, is the film employed in defendant's accused machines and for which they were designed.

"76. During 1954 defendant vacuum packaged luncheon meats experimentally in 3–D packages using its Mylar-polyethylene film and conducted a successful shipping test of some 200 of these packages but not following the methods set forth in Cloud '059 or '787 patents.

"77. By the end of 1954 the development of a machine for making the 3–D vacuum package from roll stock and stretching the film by vacuum forming was the project having highest priority in defendant's engineering department."

"22. While the Cloud machine had useful general application in the packaging field it was evident to the Clouds that if the machine could be successfully adapted for packaging meat and cheese there would be a much greater field of use of the method and machine. Hence, Cloud decided to and did ship the machine to California, in the forepart of March, 1955, to the packaging shop of Ostrow with whom Cloud arranged to have the machine experimently operated by Cloud's employee

Roselle who made periodic reports to Cloud.

"23. During the time the Cloud machine was in the Ostrow plant it was the sole property and under the control of Cloud the entire time; and Ostrow had at no time any rights by lease or otherwise in such machine and no right to display the machine to anyone for examination except by Cloud's consent. The machine was ultimately returned in 1956 to Cloud in Chicago because the application of it to packaging meat and cheese did not prove to be successful.

"24. The Cloud machine was installed at the Ostrow plant in 1955 on the same floor and in the same room where defendant's vacuum packaging machines were in operation but it was not disclosed to public inspection and examination."

"15. On or about March 2, 1955 defendant learned through its California salesman Plumley that an experimental continuous vacuum packaging machine of Cloud, the plaintiff here, was to be tested in the meat and cheese packaging plant of Ostrow at San Francisco, California.

"16. Defendant having learned of the intended installation of the Cloud experimental machine at Ostrow's and following its customary policy of keeping close watch on the development of packaging machines and the prospective market for packaging materials, sent their engineer Mahaffy to see their customer Ostrow and to see the Cloud machine, if permission could be obtained. Mahaffy arrived at Ostrow's plant on April 7, 1955, and a telephone call was made to William Cloud for permission for Ostrow to show the experimental machine to Mahaffy. Cloud gave such permission but there was no express or implied understanding or agreement between Cloud and Mahaffy. They discussed films and vacuum packaging. The defendant was the largest manufacturer or converter of packaging films in the United States and the evidence indicates that Cloud

Sr. hoped that from such inspection of his machine at Ostrow's the defendant might be able to supply or develop a better film for his machine than the Pliofilm he had used up to that date."

"78. Prior to Mahaffy's visit to the Ostrow plant on April 7, 1955 there had been no communication between defendant and any of the Clouds."

"17. At a subsequent time a meeting was arranged through Mahaffy between Cloud Sr. and officials and employees of the defendant to be held at the Ambassador West Hotel in Chicago on April 18, 1955 during the packaging show in Chicago. Out of such meeting no further understanding, express or implied, developed and no relationship of trust or confidence was established at such meeting or at such further meetings and conferences that occurred thereafter.

"18. In his inspection of the Cloud machine at Ostrow's Mahaffy observed that it was using and was adapted to use Pliofilm and after such inspection he knew of no other film which would result in better packaging that could be used on the Cloud machine which he inspected. No such better film which the defendant believed could be used on said Cloud machine was later developed or learned about by the defendant, though in June, 1956, at plaintiff Cloud's request, defendant shipped newly-developed film to Cloud for experimental use on the Cloud machine.

"19. Defendant did not fail to keep any promise or comply with any arrangement between Cloud and defendant with reference to supplying a better film in so far as it lay within its power which would be usable on the Cloud machine seen by Mahaffy at Ostrow's."

"82. On April 20, 1955 Mahaffy visited W. S. and Charles Cloud at the Cloud Machine Company between 9:05 and 11:35 a. m., during which they talked 'mostly about films.' During that visit the Clouds also took Mahaffy on a tour of their plant, showed him their drilling machines, lathes, and cer-

tain machines that they were in the process of constructing, and showed him a motion picture on orange wrapping machines. There was no vacuum packaging machine at the Cloud premises on April 20, 1955."

"84. In 1955 the Clouds approached Goodyear, Dow Chemical, Milprint, Kraft Foods and others in their search for improved and better films for use on the Cloud machine at the Ostrow plant. The Clouds were not communicating exclusively with defendant and were not relying on defendant in their search for a more satisfactory film.

"85. Plaintiff Cloud recognized that defendant's Mylar-polyethylene film then on the market would not work on the Cloud machine."

The court also found and concluded:

"14. * * *

"(d) That the evidence fails to establish or prove any joint venture or confidential relationship or relationship of trust attending or following inspection on April 7, 1955 by defendant's engineer Reid Mahaffy of the Cloud vacuum packaging process and machine then located by the Clouds at the Ostrow plant at San Francisco, California; that no such specified relationships grew out of subsequent meetings, conferences or communications between the parties.

"(e) That from such inspection of the Cloud machine at Ostrow's by Reid Mahaffy he gained ideas, concepts and understanding of the method and process of continuous roll fed vacuum packaging followed by said machine that were by him communicated to the defendant and used or adapted by defendant in producing and completing their machines 6–12 and 6–16. * *

"(f) Since there was involved no betrayal of trust or confidential relationship there was no wrongdoing constituting unfair competition in using or adapting the ideas and concepts gained from the inspection of the Ostrow

machine except in so far as infringements of Cloud '059 patent and the later '787 patent resulted. * * * "

Assuming that Mahaffy knew that the design of the Cloud machine was secret and that Ostrow had an obligation to keep it in confidence, he nevertheless saw the machine with Cloud's permission. The gist of plaintiffs' claim is that Cloud permitted the inspection in confidence, solely in order that defendant could use the information to develop a type of film which would be appropriate for use in the machine, and that defendant's use of the information for any other purpose, particularly for developing a machine of its own, constituted a breach of confidence.

"One who * * * uses another's trade secret, without a privilege to do so, is liable to the other, if * * * (b) his * * * use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him. * * * "[1]

"Likewise, the confidence does not arise if B has no notice of the confidential character of the disclosure. But no particular form of notice is required. The question is simply whether in the circumstances B knows or should know that the information is A's trade secret and that its disclosure is made in confidence." [2]

The district court found in substance that there was no express notice to Mahaffy or defendant that the disclosure was made in confidence, for a limited purpose. The finding is amply supported and we do not understand that plaintiffs really contend otherwise. They appear to claim that under the circumstances the law will imply that the disclosure was in confidence for the limited purpose of cooperative effort by defendant. Using the Restatement phrase, the claim would be that Mahaffy and defendant *should have known* that the disclosure was made in confidence.

■■ Where the facts show that a disclosure is made in order to further a

1. IV Restatement, Torts § 757 (1939).

2. Id., Comment j, p. 14.

particular relationship, a relationship of confidence may be implied, e. g. disclosure to a prospective purchaser to enable him to appraise the value of the secret, disclosure to a prospective lender to assure him of the prospects of the borrower's business, disclosure to agent, partner, or joint adventurer.[3] Here, however, no relationship between the parties existed prior to or at the time of the disclosure to Mahaffy, and although they had several discussions at later dates, of the problems involved, we find no dealing from which a relationship of confidence is reasonably to be implied.

2. *Invalidity of Cloud '787 because of prior public use.* 35 U.S.C.A. § 102 provides that a person shall be entitled to a patent unless "(b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." The application for Cloud '787 was filed January 11, 1957. The machine previously referred to was in use at Ostrow's from March, 1955, to the summer of 1956. This machine is the same as the illustration in figures 1–16 of the patent. Defendant claims that the patent is invalid because the machine was in public use while at Ostrow's, or at least its use became a public use more than one year before January 11, 1957.

In addition to the findings already quoted, the district court found as follows:

"25. During the year 1955, and more than one year prior to the filing date of the Cloud '787 patent on January 11, 1957, the Cloud machine at the Ostrow plant produced 50,000 packages that were sold by Ostrow in retail food stores in the San Francisco area in furtherance of the experimental use of the machine from which neither the Clouds nor any of the plaintiffs received any rentals or profits or expected to.

"26. In the experimental packaging on the Cloud machine at Ostrow's it was necessary to send out thousands of vacuum packaged products to the stores marketing such products so as to obtain results, over a period of time, on so-called 'shelf life' of the products. Many were returned as 'leakers' and as being unsatisfactory. The results of the tests proved so unsatisfactory that Ostrow eventually stopped using the machine and Cloud asked him to return the machine."

The court also found and concluded:

"14. * * *

"(g) That the use of the Cloud machine at Ostrow's was not a public or commercial use nor under lease or offer of lease but was an experimental and secret use which did not bar the the issuance of Cloud '787 patent though the application therefor was made more than a year after the Cloud machine was put into experimental use at Ostrow's.

"(h) That the use at Ostrow's did not cease to be experimental in character prior to one year before application for Cloud '787 patent was filed in the Patent Office."

The finding that the use at Ostrow's was secret is open to serious question. There was no express agreement or direction as to secrecy except Mr. Cloud's generalized statement, testified to by him, "We asked him to keep these machines of ours in confidence." Although Ostrow did not permit Mahaffy to inspect the machine until Cloud gave consent, Ostrow showed it to at least one other employee of defendant without permission. It was installed in a room with other Cloud machines and two of defendant's machines, and there is no evidence that employees of Ostrow were instructed to maintain any secrecy.

■ Except for purely experimental use, " 'Public use' may properly be defined as any utilization of the invention

---

3. IV Restatement, Torts, § 757, Comment j. See Hoeltke v. C. M. Kemp Mfg. Co. (4th Cir. 1935), 80 F.2d 912, 923, cert. den. 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395 (1936) ; Smith v. Dravo Corp. (7th Cir. 1953), 203 F.2d 369, 376.

by one other than the inventor where the user is under no limitation, restriction or obligation of secrecy to the inventor." [4] In addition, "The ordinary use of a machine or the practise of a process in a factory in the usual course of producing articles for commercial purposes is a public use." [5]

■ But even if the use at Ostrow's was not secret, the district court also found the use "experimental." Under the judicial interpretations of the concept of "public use" in 35 U.S.C.A. § 102(b) a use which is not secret is not a "public use" under the statute if it be experimental.

"A use for experimental purposes is not a public use 'if it is conducted in good faith for the purpose of testing the qualities of the invention and for no other purpose not naturally incident to that.'" [6]

■ Congressional policy in favor of seasonable disclosure of invention is implemented by judicial rules placing a heavy burden of proof on an inventor who permits a public use of his invention more than one year before applying for a patent. "Once a single public use of the operative device embodying the claimed invention * * * had been shown the plaintiff had the burden of establishing by full, convincing and unequivocal proof that the use was part of a bona fide program of experimentation." [7]

■ The district court was satisfied that plaintiffs had carried their burden. Reviewing this finding, with the foregoing rule in mind, we consider that it was not clearly erroneous. It is true that plaintiffs' position is somewhat weaker as to use after November 1, 1955. On that date, Cloud wrote to Roselle, his employee who was operating the machine at Ostrow's plant, "I don't think the machine can be considered an experiment any more" and that "the machine has been there long enough for them [Ostrow and his employees] to take over." Roselle left December 1. At the trial Cloud explained that he meant the machine was operating well, mechanically. The machine remained until he recalled it in the summer of 1956.

We do not think that such change as occurred November or December 1 necessarily terminated the experimental nature of the use, so that it became a public use under the statute. At least one modification was made in it later, at Cloud's direction, changing the method of sealing packages. Locating a better type of film was a major concern during this period. Cloud was using pliofilm on the machine, and although it had certain properties which made it desirable for this process, it tended to admit air to the food after a short interval. The substantial production of packages on this machine is not necessarily inconsistent with the purpose of testing the machine and the pliofilm. The learned district judge considered the evidence convincing on this point, and we cannot say as a matter of law that it was not.

3. *Alleged lack of invention because of obviousness.* Defendant averred that the differences between the subject matter sought to be patented and the prior art were such that the subject matter

---

4. Randolph v. Allis-Chalmers Mfg. Co. (7th Cir. 1959), 264 F.2d 533, 535. Accord, Watson v. Allen (1958), 103 U.S.App. D.C. 5, 254 F.2d 342, 345.

5. Electric Storage Battery Co. v. Shimadzu (1939), 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1071.

6. Hobbs v. Wisconsin Power & Light Co. (7th Cir. 1957), 250 F.2d 100, 108, cert. den. 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed. 2d 762 (1958). Accord, A. Schrader's Sons v. Wein Sales Corp. (2d Cir. 1925), 9 F.2d 306, 308; Aerovox Corp. v. Poly- met Mfg. Corp. (2d Cir. 1933), 67 F.2d 860, 861; Watson v. Allen, supra, note 4; Randolph v. Allis-Chalmers Mfg. Co., supra, note 4; George R. Churchill Co. v. American Buff Co. (7th Cir. 1966), 365 F.2d 129, 134.

7. George R. Churchill Co. v. American Buff Co., supra note 6. Accord, A. Schrader's Sons v. Wein Sales Corp., supra note 6; Aerovox Corp. v. Polymet Mfg. Corp., supra note 6; Randolph v. Allis-Chalmers Mfg. Co., supra note 4, at 536; Koehring Co. v. National Automatic Tool Co., Inc. (7th Cir. 1966), 362 F.2d 100, 104.

would have been obvious to a person having ordinary skill in the art. Defendant offered expert testimony and a number of patents tending to establish prior art.

The district court wrote no opinion, nor did it define in its findings or conclusions what it considered the invention which was the subject matter of any of the patents in suit. It made no finding describing the prior art, nor determining that the subject matter was or was not obvious to a person having ordinary skill in the art. The court did find that the 17 patents relied on by defendant did not anticipate the claims in suit, but there is no finding nor conclusion touching upon obviousness except as might be implied by the finding or conclusion that the patents are presumed to be valid, and that defendant has not met the burden of proving invalidity. Lack of more meticulous attention to the issue under sec. 103 (alleged obviousness) probably resulted from a degree of pre-occupation at the trial with the more dramatic claim of unfair competition.

The analytical steps which a court must take in order to determine the issue of validity under sec. 103 have been clearly described:

> " * * * Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. * * * " [8]

It may be enough, on rare occasion, for a trial court to take such steps mentally and give general expression to the ultimate resolution. Ordinarily it will be better to give verbal expression to each. Perhaps in this case, where the evidence of prior art comprises a number of patents and the uncontradicted explanation thereof by one expert witness, this appellate court could make the determination at the present stage without trespassing upon the area of fact finding.[9] But, in general, and we think in this case as well, it is sounder procedure for the initial determination to be made in the trial court. That court has advantages not only in determining credibility of those it sees and hears, but it has much greater flexibility, where it deems it desirable, to call counsel before it for colloquy, or to order supplementation of the evidence.[10] And where the determination of this type of issue is first made in the court of appeals, there is no court where the parties can obtain review as a matter of right.

We refrain, therefore, from attempting to decide the matter at this stage, and direct further proceedings in the district court to determine the challenge to all these patents for obviousness under 35 U.S.C.A. § 103. The district court must also be free to determine or redetermine other issues, related to or dependent upon that one. These are the issue, raised by defendant, whether Cloud '787 particularly points out and distinctly claims the subject matter as required by 35 U.S.C.A. § 112, and the issues of infringement of any of the three patents by defendant's machines 6–12, 6–14, or 6–16.

Insofar as the judgment dismissed plaintiffs' cause of action for unfair competition and determined that Patent No. 2,888,787 is valid against a challenge under 35 U.S.C.A. § 102(b) (public use), it is affirmed. Insofar as the judgment

---

8. Graham v. John Deere Co. (1966), 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545.

9. See, for a discussion of issues of fact and law with respect to validity of patents, and the function of the appellate court in reviewing trial court determinations, Armour & Co. v. Wilson & Co. (7th Cir. 1960), 274 F.2d 143, 151–156.

10. An expression of the desirability of an initial determination of validity issues in the trial court rather than the appellate court is found in an opinion by Circuit Judge Hastie in Sutherland Paper Co. v. Grant Paper Box Co. (3d Cir. 1950), 183 F.2d 926, 935, cert. den. 340 U.S. 906, 71 S.Ct. 281, 95 L.Ed. 655 (1950).

determined other issues of validity and issues of infringement and awarded relief to plaintiffs, it is reversed and the cause is remanded for further proceedings consistent with this opinion.