Alfred H. FAULKNER,
Plaintiff-Appellant,

v.

BALDWIN PIANO & ORGAN CO. et al.,
Defendants-Appellees.

Nos. 76–1588 through 76–1596.

United States Court of Appeals,
Seventh Circuit.

Heard April 25, 1977.

Decided Aug. 15, 1977.

As Modified on Denial of Rehearing and Rehearing En Banc Oct. 11, 1977.

Norman Lettvin, Chicago, Ill., for Faulkner.

Ronald L. Engel, James Van Santen, Richard R. Trexler, Theodore W. Anderson, Chicago, Ill., for Baldwin Piano & Organ Co. et al.

Before CUMMINGS and PELL, Circuit Judges, and GORDON, District Judge.*

CUMMINGS, Circuit Judge.

Plaintiff is a patentee and the owner of U.S. Patent No. 2,811,069 for an electrical musical instrument. The patent issued on October 29, 1957, from an application filed on March 3, 1951. It expired on October 29, 1974. Plaintiff prepared the patent application himself and prosecuted it on the merits *pro se*.[1]

In 1973, plaintiff filed five suits against defendants claiming that their electronic organs infringed Claims 1, 12 and 13 of his patent. In each complaint, plaintiff de-

---

\* District Judge Myron L. Gordon of the Eastern District of Wisconsin is sitting by designation.

1. Plaintiff is the sole or joint owner of 69 patents. A highly experienced electronics engineer, Faulkner had once seriously considered becoming a patent lawyer while attending De-Paul Law School in Chicago, and for a time worked in the patent departments of two corporations and in a Chicago patent law firm.

The patent involved in this suit was plaintiff's only organ patent. After 1957, plaintiff was not directly associated with the organ industry, being employed in space and military research for the federal government. However, during the entire period from 1957 to 1970 he intermittently worked on his prototype organ and in 1970 began development of an electronic music synthesizer. 189 USPQ at 701.

manded a jury trial in accordance with Rule 38(b) of the Federal Rules of Civil Procedure and limited his claim under 35 U.S.C. § 284 for money damages only. In the complaints filed January 17, 1973, against Baldwin, Chicago Musical Instrument Co. and Wurlitzer, Faulkner asserted he first learned of these defendants' infringement in April 1972. In the complaints filed March 29, 1973, against Hammond and L & G Enterprises, Inc. plaintiff asserted he first learned of their infringement in 1973. All five complaints limited the claim for recovery under 35 U.S.C. § 286 to infringing acts occurring within the period of "six years prior to the filing of the complaint" and to any infringing acts occurring subsequent to the filing of the complaint. The cases were consolidated for trial and appeal.

The defendants, except L & G Enterprises, Inc., first asserted the affirmative defenses of laches and estoppel, and the district court held preliminary hearings limited to those subjects on June 26–27, 1973. After June 27, 1973, discovery proceeded on all issues. Judge Will held a 35-day bench trial on the issues of laches and estoppel beginning on June 6, 1974, which continued intermittently until November 6, 1974. On January 14, 1975, the same defendants filed motions for summary judgment on the ground that the stipulation of uncontested facts and the evidence already before the court established that the Faulkner patent is invalid. On April 16, 1976, the district court entered 219 findings of fact and 16 conclusions of law, together with a comprehensive opinion holding that plaintiff's complaint must be dismissed with prejudice and with costs to defendants. These rulings are reported in 189 USPQ 695.

In its conclusions of law, the district court held that summary judgment was appropriate on certain validity issues as to Claims 1, 12 and 13 of the Faulkner patent "since the prior art, history of the prosecution of the application leading to the issuance of the patent and the patent itself are all documents capable of interpretation upon examination and all other facts relevant to validity are undisputed" (189 USPQ at 716). The court refused to rule on various grounds of invalidity tendered by defendants where material issues of fact existed (189 USPQ at 717–719; 726–727).

Claim 1 of the patent was held invalid under the "late claiming" doctrine of *Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co.*, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171, and under 35 U.S.C. § 132[2] if read to encompass keying of square waves by all forms of non-linear conducting devices. However, Claim 1 was held valid when properly read with its scope limited to the keying of the square waves by the use of neon or glow tubes. Since none of defendants' accused organs utilized neon or glow tubes to key square or rectangular tone waves, none was held to infringe plaintiff's Claim 1. Similar rulings were made with respect to Claims 12 and 13. If read to be broader than Claim 1 as to the type of keyer concerned, Claims 12 and 13 were held invalid under 35 U.S.C. § 121 and 37 C.F.R. § 1.141 forbidding the claiming of two or more inventions in one application.

Although Judge Will realized that his resolution of the summary judgment motion rendered the issues of laches and estoppel moot, he resolved this question as well as "an exercise of sound judicial administration." 189 USPQ at 727. Accordingly, the court also decided that the doctrine of laches foreclosed plaintiff from asserting any claims for alleged infringement prior to May 2, 1972, when notices of infringement were first served on the defendants. Finally, the court concluded that the doctrine of estoppel foreclosed plaintiff from asserting any claims against defendants for infringement of his patent. We affirm on the basis of *Muncie Gear Works, Inc., supra*, and 35 U.S.C. § 121 as implemented by 37 C.F.R. § 1.141. Therefore, we do not reach the other questions decided by Judge Will. Because summary judgment was proper on

---

**2.** 35 U.S.C. § 132 provides in pertinent part that "No amendment shall introduce new matter into the disclosure of the invention."

this record, there was no need for the district court to hold a jury trial as to the validity of plaintiff's patent. *Research Corp. v. NASCO Industries, Inc.*, 501 F.2d 358 (7th Cir. 1974); *Townsend Co. v. M.S.L. Industries*, 359 F.2d 814 (7th Cir. 1966).

In *Muncie Gear Works, Inc., supra*, a unanimous Supreme Court invalidated a patent on a water propulsion device. There the patentee filed a patent application on August 25, 1926, which did not suggest in any way the combination later asserted as his invention. The defendants relied on the predecessor to 35 U.S.C. § 102(b), which provided that a person shall not be entitled to the issuance of a patent if the invention was "in public use or on sale in this country for more than two years prior to his application". 315 U.S. at 766, 62 S.Ct. at 869. After noting that all of the patentee's amendments filed as of December 8, 1928, like the original application, wholly failed to disclose mention of the invention later asserted under March 30, 1929, amendments, the Court found that there was a public use or sale of the device which the claims of the patent were alleged to cover by the licensee of the patent in early 1926 and by a competitor in early 1927. Consequently, the Court invalidated the claims of the patent. Judge Will summarized the *Muncie Gear* doctrine as follows:

"The Court concluded that, since a new application would have been statutorily barred if made more than two years after the first public use or sale of a device embodying the alleged invention, an amendment seeking to achieve indirectly what could not have been achieved directly, was improper and the patent invalid" (189 USPQ at 721).

Because the former two-year bar of 35 U.S.C. § 102(b) was reduced to one year in 1939 (53 Stat. 1212), the late claiming doctrine of *Muncie Gear* was of course correspondingly modified. See 315 U.S. at 766 n. 8, 62 S.Ct. 865.

The Faulkner patent generally concerns electronic organs which use direct current (DC) keying instead of alternating current (AC) keying. DC keying permits a smooth "attack" or "decay" of the tone signal so that the musical tone effect of "percussion" or "sustain" can be achieved as contrasted to the instantaneous sound and resultant undesirable "click" produced by AC keying. Claim 2 of Faulkner's original application, which became Claim 1 of the Faulkner patent as issued covered "a tone signal source, a translating device, and a [neon] glow tube attenuator connected between said source and said device" in a musical instrument.[3] Nowhere in the original application is there any reference to anything other than neon glow tubes as keying devices. Throughout the entire six years' prosecution of the application, only neon glow tubes were disclosed as the electronic keying devices in the patent specifications. Faulkner's prototype, built from 1951 to 1956, utilized only

---

3. The trial court's findings of fact 11–13 are set forth below as a glossary to aid in the understanding of this opinion:

"11. The term 'rectangular wave form tone generator' in Claim 1 refers to an element which generates a rectangular wave having a particular frequency. The term 'translating device' in Claim 1 refers to a speaker. The term 'non-linear conducting device' in Claim 1 refers to a device that is electrically coupled to the 'rectangular wave form tone generator' so as to conjunctively operate in a certain manner. The term 'bias potential' in Claim 1 refers to a variable DC voltage that is applied to the non-linear conducting device. The term 'means to vary the bias potential' in Claim 1 refers to a resistance-capacitance (RC) circuit by which the magnitude of the DC voltage applied increases after the playing key (or pedal) is actuated and the magnitude of the DC voltage applied decreases when the playing key (or pedal) is released. The term 'tone signals' in Claim 1 refers to the wave generated by the tone generator. The portion of the Claim 1 circuit that includes the non-linear conducting device is generally called a 'keyer' or 'gate.'

"12. The term 'keyer' or 'DC keyer' is used in the organ art to refer to an electronic switch, while the term 'keyswitch' or 'AC keyer' is used in the organ art to refer to a mechanical switch, and transmitting a tone signal by a keyer may be called 'keying.'

"13. 'Attack' refers to the time when the playing key (or pedal) is actuated and the tone level is increasing, and 'decay' refers to the time when the playing key (or pedal) is released and the tone level is decreasing. An extended decay is known in the organ art as 'percussion' or 'sustain.' " 189 USPQ at 698.

neon glow tubes as the keying elements and it did not embody Claims 12 and 13 which Faulkner considered to be auxiliary. It was scrapped by plaintiff a month before filing the first three of these lawsuits.[4]

In May 1952, plaintiff filed an amendment which again described the keying device as a "glow tube attenuator." However, in July 1954, he filed a second amendment which changed the description of the keying device from "glow tube attenuator" to "gaseous tube." This amendment was rejected by the Patent Examiner in September 1956 because "[t]here would be no invention in merely substituting a gaseous tube * * * for the diode 2 of George" patent No. 2,483,823. In an affidavit of February 22, 1975, and on earlier occasions, Faulkner agreed with the Examiner that the gaseous tube and the diode utilized as the keyer in the George patent were equivalent (Plaintiff's App. 254).

In December 1956, plaintiff filed a third amendment amending then Claim 2 to its final form, substituting, for the first time, "non-linear conducting device" for the previously described neon glow or gaseous tubes as the specified keying device. He contends that he intended both neon glow tubes and diodes to be covered by this generic substitute phrase. In general, Claim 1 in its final form relates to a circuit for DC keying tone signals to achieve percussion or sustain without frequency distortion.

In July 1955, defendant Lowrey Organ Company, subsequently purchased by defendant Chicago Musical Instrument Co., exhibited and played its Model SS organ with DC Keying at the National Association of Music Manufacturers (NAMM) in Chicago and again at its 1956 show in New York. This utilized a square wave tone generator keyed by a vacuum tube diode and was the first publicly exhibited electric organ to achieve desired attack, sustain and decay characteristics (artificial reverberation of musical notes to simulate pipe organ and musical instrument sounds). The Model SS organ was developed by Walter Anderson, then Lowrey's chief engineer, who obtained Patent No. 2,823,310 on it. In creating the DC-keyed Model SS organ, he employed tone generator disclosures in Langer Patent No. 2,533,821 (issued in 1950) owned by Lowrey and vacuum tube diode DC keying disclosures in George Patent No. 2,483,823 (issued in 1949) owned by the Thomas Organ Co., which has been dismissed as a defendant.[5] He was not concerned too seriously about infringing the George patent by using a diode keyer because he believed Thomas to be infringing Lowrey's Langer patent. Only the four and eight foot ranks were DC-keyed.[6] The first SS model was sold in 1957.

4. The timing of the junking of the prototype is curious since Faulkner moved the organ, which weighed as much as a piano, along with his household furnishings during his various moves between 1951 and December 1972. Faulkner apparently lived in the following locations in this period: Chicago, Illinois; Torrance, Redondo Beach, and Santa Barbara, California; and West Allis and Greendale, Wisconsin. 189 USPQ at 701. Because the prototype was scrapped, the defendants were forced to construct an elaborate and expensive test circuit demonstrator for the trial.

5. Anderson believed that the Faulkner "combination" as applied to diode keying was covered by George. Indeed by Faulkner's own admission:

"the combination of the Figure 6 keying circuitry of the George patent with a rectangular wave tone generator is substantially identical to Claim 1 of the Faulkner patent. Thus, when used with a rectangular wave tone generator (as inherently suggested), the George patent in its Figure 6 embodiment teaches diode keying of signals to achieve sustain without Faulkner Distortion and thereby anticipates Faulkner's Claim 1." 189 USPQ at 704.

6. CMI later developed an LS model, which was generally similar in structure and operation to the SS model, which could be profitably marketed at less than $1,000. This more economical version was audibly demonstrated at the July 1957 NAMM show. The "sustain" and "percussion" features were emphasized in the hand-out literature distributed at the 1957 NAMM show. While a number of square wave tone generators were used on the LS model, most were not DC-keyed. The entire lower manual as well as the 16 foot and quint ranks were all AC-keyed. Only the four and eight foot ranks were DC-keyed. The "LS insofar as the sustain circuitry is concerned was identical to the SS * * *" (D.App. 86).

■ Upon the foregoing uncontested facts, we hold that the *Muncie Gear* doctrine requires a determination that the Faulkner Claim 1 is invalid.[7] The third amendment of Claim 1 (then Claim 2) if made, as Faulkner insists, in December 1956 to cover not only a neon glow tube keying device but also to include any other non-linear conducting device constitutes an impermissible enlargement of the original claims, the basis for which was not disclosed therein.[8] This is because the amendment occurred more than one year after the Lowrey Model SS (upon which the enlarged claim concededly could be read (D.App. 73–74)), utilizing diode keying of square waves, was first put into public use by virtue of its July 1955 public demonstration at the Chicago show of the National Association of Music Manufacturers. When that model was played, a visitor to the trade show could hear percussion notes fading away after keys are released, suggesting "reverberation" or the slow decay of a tone signal, thus revealing some DC keying.

Indeed, at the trial, plaintiff did not dispute Anderson's testimony about the circuitry of the SS organ displayed at the 1955 show. Anderson explicitly stated that the Model SS introduced at the 1955 show had DC keying. Plaintiff tries to introduce a question of fact on whether the SS model at the 1955 show actually had DC keying as Faulkner concedes the 1957 production model did (D.App. 73–74). In a report by Hammond engineer Alan Young on the SS model demonstrated at the 1956 NAMM show, he indicated that "Percussion notes fade away after keys are released, suggesting reverberation." Some AC keying circuits can give the impression of sustain. 189 USPQ at 716. In a chart appended to this report, Young indicated his opinion that the organ had AC keying. In a similar report on the 1957 NAMM show, Young states:

"The *Lincolnwood*, costing $1,695.00 became available this year and is the experimental model shown at the two previous Shows. It contains the same generator system, but the keying is improved to D.C.-keying, which eliminates key click and makes possible slow decay percussion after keys are released." (P.App. 364)

This apparent inconsistency can be resolved when it is recalled that only a minority of the tone generators in the SS organ were DC-keyed. Thus it is possible that Young only heard AC keyed sounds while viewing the SS model. Indeed, next to the column labeled "keying circuit," Young placed a notation (in the row of the chart describing the characteristics of the SS organ) which appears to read "Pedal Rail." Since the pedal tones of the SS model were AC-keyed, note 6 *supra*, this notation impeaches the document's conclusion that *all* of the tone generators in the organ were AC-keyed. The chart also declares that the Model SS had a "Decay after key release," a phrase usually indicative of DC keying.

■ In any event, Faulkner never attempted to contest Anderson's testimony during the estoppel trial that the SS model displayed in the 1955 show did have DC keying. Such a contest would have been relevant to the early commercial activity in the field by Lowrey, and hence would have been relevant to the ultimate trial issues of laches and estoppel. Moreover, in its February 28, 1975, opposition to defendants' summary judgment motion, plaintiff offered only the following conclusory statements:

"As the record in this case presently stands, there is no reliable evidence as to being operated by said variation of said bias potential to control the amplitude of tone signals transmitted from the tone generator to the translating device, said rectangular waveform preventing frequency distortion of the tone signals despite the non-linear characteristic of said conducting device."

---

7. Claim 1 provides:

"1. In a musical instrument, a rectangular waveform tone generator, a translating device, a non-linear conducting device connected between said tone generator and said translating device, a source of bias potential for said nonlinear conducting device, means for causing said bias potential to vary in a continuous manner, said conducting device

8. See *Chicopee Manufacturing Corp. v. Kendall Co.*, 288 F.2d 719, 723–724 (4th Cir. 1961).

what CMI's [then Lowrey's] 'SS' organ embodied.

\* \* \* \* \* \*

"Further, there is a genuine issue of material fact as to whether any item designated as a 'Model SS' contained non-linear DC-keying of square waves at any critical date."

Because defendants' motion was supported by Anderson's unchallenged testimony, the plaintiff was obliged to provide affidavits or other evidentiary vehicles to set forth specific facts showing a genuine issue of whether the SS model shown in 1955 was DC-keyed. This the plaintiff failed to do. As a result, summary judgment was proper. Rule 56(e), Federal Rules of Civil Procedure. Plaintiff did not point to any "specific facts" required by Rule 56(e) until he highlighted the Young report to us. Since the Young report was not referenced in plaintiff's opposition to defendants' motion for summary judgment, the trial court's entry of summary judgment may not be disturbed. *Southern Rambler Sales, Inc. v. American Motors Corp.*, 375 F.2d 932, 937 (5th Cir. 1967). ("Meet these affidavit facts or judicially die.")

Plaintiff's charge in a letter of June 20, 1972, repeated in his deposition, that the SS organ infringed his patent belies his present assertion that the Lowrey instrument did not employ any DC keying or rectangular waveform generating means. Although he has accused defendant Lowrey of infringing his patent through its Model SS organ, he could not have done so before his 1956 amendment broadened his claim, for a "glow tube" does not describe or encompass a "diode" but, according to plaintiff, "non-linear conducting device" (used in the December 1956 amendment) does. None of the accused organs used the neon glow tubes of Faulkner's prototype but instead used other non-linear conducting devices to key square tone waves.

■■■ In claiming that the accused organs violated his patent, plaintiff necessarily relies on the phrase "non-linear conducting device" introduced in his third amendment of December 1956. If Claim 1 is to be read broadly to cover all forms of non-linear conducting devices,[9] it includes the vacuum tube diode keyer first put into public use by Lowrey in July 1955 at the Chicago show. Since this was more than a year before plaintiff's third amendment, Claim 1 of the Faulkner patent is invalid under the "late claiming" doctrine of *Muncie Gear* because an amendment may not accomplish what a new application is not permitted to accomplish under the one-year bar of 35 U.S.C. § 102(b). The public exhibit and demonstration of the Lowrey Model SS at the Chicago show, regardless of a Hammond Organ employee's description of it as experimental, satisfies the term "public use" as used in *Muncie Gear* and 35 U.S.C. § 102(b). *Cloud v. Standard Packaging*

---

**9.** The patent itself contains internal evidence of inconsistency:

"Every claim, other than Claim 1, still refers either to a 'glow tube' (Claims 2, 3 and 6), a 'gaseous tube' (Claims 4 and 5), a 'keyer,' 'keyers' or 'electronic keyers' (Claims 9, 10, 12, 13 and 14), or makes no reference to a keying device at all. No claim refers to a vacuum tube diode much less to a solid state diode or transistor all of which Faulkner now insists are covered by his Claim 1.

"Moreover, in describing the keyer, the patent (col. 4, line 56, through cols. 5, 6 and 7, line 58) speaks repeatedly and only of glow tubes, keyer glow tubes or keyer tubes. Nowhere is there any reference to any other DC keying device. On the contrary, the patent describes the keyer as follows (col. 4, lines 58–62):

"In general, the keyer consists of a *glow tube* connected between a tone source and a load circuit together with circuit arrangements for impressing a variable bias voltage on the *glow tube*. (underscoring supplied in original)"

189 USPQ at 723.

This and other evidence caused the district court to state:

"We believe \* \* \* that all of the evidence points unequivocally to the conclusion that the Faulkner patent is limited to the use of glow tubes to key square waves." *Id.*

Because we choose not to reach estoppel issues, we do not decide whether Faulkner should be estopped from denying that he always intended his patent to include only neon glow tubes.

# 684

*Corp.*, 376 F.2d 384, 389–390 (7th Cir. 1967).[10]

■■■ As Judge Will held, since the "keyer" referred to in Claims 12 and 13[11] is the keyer of Claim 1, those claims are invalid if read to include any and all keyers using non-linear conducting devices. Plaintiff asserts that the three claims in issue "are for different combinations and have different scope" (Br. 15). He, therefore, suggests that the "electronic keyer" referred to in Claims 12 and 13 includes devices other than the "non-linear conducting device" of Claim 1. This argument is blatantly specious and "not in our opinion tenable" (189 USPQ at 726) when viewed in the light of the patent specifications.[12] *United States v. Adams*, 383 U.S. 39, 49, 83 S.Ct. 708, 15 L.Ed.2d 572. The patent clearly states that the disclosed keyer is the gist of the "invention":

> "As the keyer is regarded as the most important element of the invention, its operation will be.described first" (App. 228).

The patent goes on to give two explicit "embodiments" of the keyer (App. 229–230). At best the patent claims a generic class of keyers and the patent describes two specific glow tube variants. Even if the generic class of claimed keyers is assumed to include variants not embodying glow tube components (which is a highly dubious assumption), the term "electronic keyer" in Claims 12 and 13 does not have a different meaning than the described keyer in Claim 1. Indeed, the patent itself discloses that:

> cal scale, a plurality of signal channels having different transmission characteristics, an electronic keyer connected between each of said generators and each of said signal channels, a common biasing means for simultaneously operating a plurality of said keyers, a translating device, and registration controls connecting said signal channels to said translating device."

Plaintiff states that Claim 13 differs from Claim 12 "only in that the signal channels are specified as 'having different transmission characteristics' " (Br. 16). It is dependent on Claim 12 since it incorporates all of that claim's elements. No licenses under Claims 1, 12 or 13 have ever been granted in the electronic musical instrument field.

---

**10.** Young's 1956 report also stated that the new model, shown for the second year, "is promised for release by the first of next year" (P.App. 361). Neither the fact that the Lowrey organ was not available for sale to customers until May 1957 nor Hammond's characterization for the SS model as "experimental" makes the 1955 showing "experimental" in the technical sense of a non-public use. In this Circuit, commercial exploitation at a trade fair is not "experimental" in this sense because it is "not naturally incident to * * * the purpose of testing the qualities of the invention." *Cloud, supra*, 376 F.2d at 390. See also *Electric Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1071; *Magnetics, Inc. v. Arnold Engineering Co.*, 438 F.2d 72 (7th Cir. 1971); *Kardulas v. Florida Machine Products Co.*, 438 F.2d 1118, 1123–1124 (5th Cir. 1971); *Koehring Co. v. National Automatic Tool Co.*, 362 F.2d 100, 103 (7th Cir. 1966); *Atlas v. Eastern Air Lines, Inc.*, 311 F.2d 156, 159–160, 161–162 (1st Cir. 1962); *Connecticut Valley Enterprises, Inc. v. United States*, 348 F.2d 949, 952 (Ct.Cl.1965).

**11.** Claims 12 and 13 provide:

"12. In a musical instrument, a set of tone generators for producing signals at frequencies corresponding to the notes of the musical scale, a plurality of signal channels, an electronic keyer connected between each of said generators and each of said signal channels, a common biasing means for simultaneously operating a plurality of said keyers, a translating device, and registration controls connecting said signal channels to said translating device.

"13. In a musical instrument, a set of tone generators for producing signals at frequencies corresponding to the notes of the musi-

**12.** 35 U.S.C. § 121 states that the "validity of a patent shall not be questioned for failure of the Commissioner to require the application to be restricted to one invention." Thus if it is manifest that a single issued patent claims two or more independent and distinct inventions, the patent would be valid assuming it was free of other defects.

However, 35 U.S.C. § 121 also provides that "[i]f two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions." By way of 37 C.F.R. § 1.141 (35 U.S.C.A.App. I at 690), the Commissioner has made this requirement mandatory. Thus if a claim is ambiguous, *i. e.*, capable of being read as an independent and distinct invention or just another claim of one invention, the statute and regulation together create a presumption against reading the claim as an independent and distinct invention.

"it is the aim of the appended claims to include all such variations and modifications as fall within the true spirit and scope of the invention" (App. 225).

By cross-appeal, defendants insist that they were entitled to recover attorney's fees under 35 U.S.C. § 285, which provides that a court "in exceptional cases" may award reasonable attorney's fees to the prevailing party. Thirty-eight volumes of testimony were taken over a period of 35 days before the long-experienced trial judge. After listening to the testimony and reviewing the voluminous documentary evidence in preparation for his findings of fact, conclusions of law and opinion, Judge Will refused to consider the case "exceptional" and therefore did not award attorney's fees to defendants. Because of the facial breadth of the claims in issue, we cannot say that plaintiff's suits were harassing and extortive. If Judge Will had concluded that Faulkner's conduct was unconscionable and deceptive, he would have granted defendants' request for attorney's fees. Instead, he did not find that this consolidated lawsuit was prosecuted in bad faith. In fact, from his testimony, Judge Will "thought he [plaintiff] was a straightforward fellow" (April 16, 1976, Tr. 21).

In *H. K. Porter Co. v. Black & Decker Manufacturing Co.*, 518 F.2d 1177, 1178–1179 (7th Cir. 1975), we recently determined that attorney's fees are only awarded in this Circuit in exceptional patent cases to prevent gross injustice where fraud and wrongdoing are clearly proved. The court below found no gross injustice, nor did it find that defendants had proved fraud and wrongdoing by plaintiff. Since defendants have not shown that the district judge abused his sound discretion in not allowing them attorney's fees, his disposition of the matter will not be disturbed here. *Rockwell v. Midland-Ross Corp.*, 438 F.2d 645, 655 (7th Cir. 1971).

As defendants' reply brief as cross-appellants has reminded us,

"The District Court presided over pre-trial discovery for two years; held evidentiary hearings on 35 days over a period of a year; and had ample opportunity to evaluate the demeanor of Mr. Faulkner and many other witnesses. Hundreds of documentary and physical exhibits were received in evidence. Organs were played. Demonstrations were made. Experts testified. Additional hundreds of pages of briefs were submitted by counsel for the assistance of the District Court." (Reply Br. 1–2)

In such circumstances, the district court was in the best possible position to assess attorney's fees against plaintiff if it deemed it suitable to do so. Similarly, we have had to study lengthy briefs and a voluminous record before deciding this case. Like the district court, we do not view it as the kind of case where attorney's fees should be awarded to defendants on the basis of the posture of their appeal.

Judgments affirmed.[13]

13. Plaintiff's April 19, 1977, motion for an order "to remove from this Court's files, and to excise or otherwise obliterate pages 176 through 188 from the defendants' Appendix," which purport to show that plaintiff's counsel specifically asked for a "separate non-jury trial on [laches and estoppel] prior to trial on the issues of validity and infringement" (D.App. 177), is denied.